UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF LOUISIANA

SCOTT J. BUTLER                                     CIVIL ACTION NO. 12-420
Plaintiff,

VS.                                                          MAGISTRATE JUDGE: DALBY

STATE OF LOUISIANA,
LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS,
LOUISIANA STATE POLICE AND
CAPTAIN TOM MADDEN                          JUDGE: JACKSON
          Defendants.

<u>MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT</u>

**NOW INTO COURT** through the undersigned counsel, comes LOUISIANA

DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, LOUISIANA STATE POLICE

("DPS") AND CAPTAIN TOM MADDEN who respectfully submits this memorandum in

support of Motion for Summary Judgment. For the reasons provided below, Defendants are

entitled to summary judgment as a matter of law and Plaintiff's claims should be dismissed with

prejudice.

**I.     FACTUAL BACKGROUND**

Plaintiff, Scott Butler, was employed as a Louisiana State Police ("LSP") officer from

September 2000 to April 3, 2013. Butler attended the LSP Training Academy, and then served

as a road trooper from 2000 to 2005 at LSP Troop G, headquartered in Bossier City. Thereafter,

he worked in the LSP Gaming division from 2005 to 2010 where he was assigned to enforce

State Gaming regulations at Casinos. In mid 2010, Butler was transferred to the LSP

Intelligence Division due to a downsizing in the Gaming Division.[1]   He did not stay at Intelligence long, transferring back to road patrol at Troop G in November 2010.  It is then, upon his return to Troop G under Troop Capt. Tom Madden, that plaintiff allegedly began suffering discriminatory treatment.  However, the record reflects that DPS and Madden were justified in all respects in responding to reasonable concerns raised by plaintiff's job performance at Troop G.   Although plaintiff does not challenge events before November 2010, plaintiff's DPS supervisors first became concerned with his job performance before he can back to Troop G, while he was assigned to Intelligence.

Plaintiff's supervisor at Intelligence, Sgt. Jason Turner, began noticing certain behavior in plaintiff which was out of character for a State Trooper with 10 years experience.  Turner documented plaintiff's performance in his supervisory file, as he does with all Troopers under his command, for the purpose of drafting the employee's Annual Performance Rating.  Turner's performance log for Butler noted both positive and negative actions by Butler during the limited period Butler worked under Turner at Intelligence.[2]  One of Turner's biggest concerns was that plaintiff was unable to grasp the legal concepts of reasonable suspicion and probable cause which again, Turner felt was inexplicable for a State Police officer with Butler's years of service.  Plaintiff was assigned to work a check fraud case, and he did not want to list the person being investigated under the category "suspect" on an evidence tracking form, because plaintiff was not "for sure" he had sent fraudulent checks.   Turner explained how reasonable suspicion existed, because both the suspect and his wife *admitted* sending the checks and that other competent evidence linked the suspect's vehicle to the crime.  Butler still did not want to list the

---

[1] Exhibit Y, Plaintiff's depo. Pg. 15
[2] Exhibit A, Affidavit of Jason Turner.

individual as a suspect, because he did not actually witness the suspect commit the crime and was not "for sure" that he did it.[3]

Turner also noticed that plaintiff engaged in the following bizarre behavior: (1) asking his supervisor if it was ok to turn off a bathroom light; (2) interrupting Turner's traffic work to inform him, "I don't think you like me"; and (3) failing to grasp that Turner was making a joke when Turner told Butler that he would have to kill any non-State Police person who incidentally observed a procedural order on Butler's computer screen.  Butler asked Turner on three separate occasions if he was serious about the joke.[4]

On or about October 7, 2010, Turner recommended placing plaintiff under an internal Field Officer Training Program .  Plaintiff resisted and stepped up his request to transfer out of Intelligence and back to road patrol at LSP Troop G in Bossier.  The transfer was completed on November 1, 2010.

After his transfer to Troop G, Butler was required to ride-along with other troopers to acclimate him to new procedures and technology.  This is a standard procedure for all troopers who have been absent from road patrol for an extended period of time.[5]  Butler first rode with three officers with Team C, (one of five teams Troop G is divided into) and the pursuant to standard procedure, each officer maintained performance logs of the ride along.[6]  Butler's failed to adequately perform the tasks required of Road Troopers which posed a safety risk to him, the public, and other officers.  Some of the performance concerns occurring while Plaintiff was assigned to Team C included the following: (1) abruptly interrupting and leaving his Taser recertification without explanation and thereafter, only handling the Taser with a wad of

---

[3] Exhibit A, Affidavit of Jason Turner,  DPS 0262.
[4] Exhibit A, Affidavit of Jason Turner, DPS 0262, 0267, 0269.
[5] Exhibit AA, Kilpatrick Deposition, pg. 89.
[6] Exhibit D Affidavit of Bridges, Exhibit C Affidavit of  Green and Exhibit B, Affidavit of Beck.

bathroom napkins wrapped around the Taser handle; (2) failing to disarm an individual during a traffic stop during a traffic stop; (3) wrapping a piece of paper around a gun to give it back to an individual; (4) poor technique on field sobriety tests; and (5) allowing a violator to make Butler second guess a clear traffic violation during a traffic stop.[7]

After a month of riding with officers at Team C, it was apparent Butler needed additional training.[8] Madden assigned him to ride along with officers in Team E and those officers likewise, generated performance logs.[9]  Plaintiff's performance did not improve and additional safety concerns were raised during this period.  The following is a list of some of the most troubling behavior he exhibited: (1) refusal to remove a knife from violator's pocket and instead, allowing the violator to place the knife within his own reach; (2) continued poor technique on Field Sobriety Tests; (3) allowing a speeding violator to negotiate what speed would be placed on the ticket; (4) inability to decide whether to tow an impaired driver's vehicle or drive the vehicle into a secured parking lot; and (5) not knowing how to fill out probable cause section of an arrest report.[10]

On January 26, 2011, after reviewing the performance logs from Intelligence and the ride-along reports from Team C and E, Madden recommended plaintiff participate in a psychological fitness for duty examination (FFDE).[11] DPS contracted with a third party, Matrix, Inc., to conduct FFDEs which were performed by licensed psychologists with special training and experience in police psychology.  Per DPS protocol, the job performance documentation was submitted to Captain William Davis, Commander of DPS Internal Affairs Division to compile the information to meet Matrix's standard and submit it to Matrix.  Internal Affairs does not

---

[7] Exhibit E, Affidavit of Brent Peart; Exhibit B, Affidavit of George Beck, DPS 0256-0257.
[8] Exhibit Z, Madden depo pgs. 53-55.
[9] Exhibits F, G, & H- Affidavits of Paul Harris, Doug Pike, and Stephen Lowery.
[10] Exhibits F, G, & H Affidavits of Paul Harris, Doug Pike, and Stephen Lowery, DPS 0313-0314, 0317-0318.
[11] Exhibit Z, Madden Depo. Pgs. 48-49, and 77.

conduct an investigation of the information submitted.    Receipt of such materials and any subsequent FFDE results differs from other Internal Affairs files in that it is maintained secure and confidential, outside of an employee's personnel file.[12]   Capt. Davis then sent it to Matrix for a pre-fitness review, whereupon Matrix psychologist, Dr. Carey Rostow, reviewed it.   Rostow determined an FFDE should be conducted.   Butler appeared for his fitness for duty exam on February 8, 2011 at Matrix in Baton Rouge, and in the course of the exam, Butler submitted a February 1, 2011 letter from a Theresa Stewart, identified in the letter as a psychiatric nurse practitioner with LSU Health Sciences.[13]   Stewart's letter states that Butler was diagnosed with Obsessive Compulsive Disorder in November 2010, and had been under treatment for the condition.[14]   Stewart's letter reflects that Butler acknowledged to her that his mental health condition *was interfering with his job performance* in November 2010, the time period directly before his first fitness for duty exam.[15]

Dr. Rostow conducted a comprehensive FFDE which included an interview, administration of the MMPI, PAI, and other behavioral health assessments recognized in the police psychology community as assistive in identifying law enforcement FFD.[16]   Rostow determined that Butler was not fit for duty, meaning that he had an identifiable mental condition that was related to the behaviors described in the performance logs and constituted a direct threat to him and others.   The day the report was issued, February 9, 2011, Butler was relieved of duty.

---

[12] Exhibit CC- William Davis depo. p 9-12.
[13] Defendants note for the record that they filed a Motion to Compel seeking to conduct discovery regarding Stewart's and Butler's other psychological treatment providers' opinions and treatment over plaintiff's objection on grounds of privilege.   The Court upheld the privileged [Doc. No. 42]; however, Defendants maintain that plaintiff cannot offer purported expert opinion evidence while blocking DPS from cross-examining the expert on qualifications, methodology, reliability, etc. on grounds of mental health privilege.
[14] Exhibit O, Theresa Stewart 02/1/11 letter (DPS 2556-2557).
[15] Exhibit O, Theresa Stewart 02/1/11 letter (DPS 2556-2557)..
[16] Exh.AA, Rostow depo pgs. 74-92, and Exh. P,  Rostow 02/08/11 FFDE report.

On or about the same day plaintiff was relieved of duty, Madden received a call from Psychiatrist Dr. James Patterson who informed Madden that Butler was fit for duty.[17]  Madden advised Patterson that DPS needed a written statement.[18]  The next day, Patterson authored a report[19] which states an opinion that Butler was still suffering OCD, but that the condition was not severe and "not bothersome in nature."  Although Patterson's report is dated February 10, 2011, plaintiff did not submit it to DPS until March 2, 2011, apparently choosing to exercise the leave of absence he had been extended by DPS.

In the period between Butler being relieved of duty and DPS's receipt of Patterson's report, plaintiff retained attorney Pam Jones.[20]  He filed an EEOC Charge of Discrimination on August 1, 2011 and on or about June 4, 2012, plaintiff filed the instant lawsuit.[21]

On March 7, 2011, Butler returned to work at Team C, and DPS continued him on ride alongs with other experienced troopers as he had been before the FFDE and leave of absence. Attorney Jones objected and DPS acquiesced, allowing him to ride alone effective March 7, 2012.[22]

As part of annual rotation, plaintiff was transferred to Team D in July 2012 under the supervision of Lt. Kevin Baxter.  During the latter part of that year, Baxter observed plaintiff to exhibit poor job performance.  Baxter noted in his supervisory file that plaintiff was questioning authority and that he exhibited inadequate field sobriety testing skills, including on one occasion failing to arrest an intoxicated minor when two other troopers on the scene determined that he

---

[17] Exhibit Z, Madden Deposition, pgs. 86-87.
[18] Exhibit Z, Madden depo, pgs. 86-87.
[19] Again, defendant notes for the record that it has been prevented from deposing plaintiff's designated expert witness, Dr. Patterson, on grounds of privilege.  To the extent that plaintiff seeks to offer expert medical opinion evidence that he was fit for duty in rebuttal to Rostow's opinions, defendant objects.  Simultaneous with the filing of this Motion, Defendant is filing Daubert motions on this issue.
[20] Exhibit DD, correspondence from Jones to DPS dated  March 7, 2011
[21] Plaintiff amended the complaint several times to add additional claims, including adding allegations of unlawful termination after he was ultimately fired in April 2013.
[22] Ex DD, Letter sent by Plaintiff's attorney requesting for Butler's ride alongs to cease (DPS 0052-0053).

was clearly impaired and the minor ultimately tested well over the legal limit.[23]    Additionally,

Butler exhibited illogical and/or irrational behavior when Baxter met with him on December 9,

2012 to discuss conclusions in several crash reports, which contained inadequate and/or

incomplete information.    Plaintiff refused to accept Lt. Baxter's recommendations to conduct

additional investigation to rule in or out other reasonable causes for the crash and to clarify the

report to accurately reflect what was known versus what was unknown.[24]

Pursuant to LSP Policy-P.O. 219, plaintiff filed a personnel grievance against Baxter

alleging that Baxter threw a crash report at him during the above described December 9, 2012

meeting and that Baxter's recommended edits would have undermined the integrity of the

reports.[25]  Since plaintiff was suing Capt. Madden at the time plaintiff filed the grievance, Major

Joel Kilpatrick, Butler's next line supervisor, was assigned to conduct the Step One Level

grievance review.    Kilpatrick reviewed the grievance form and a written response from Baxter

and exercised his direction to meet Butler in person to interview him about the grievance.[26]

Kilpatrick met with plaintiff on January 2, 2013 about the grievance.    According to Maj.

Kilpatrick, his expectation for the meeting was:

> I was in hopes that by explaining to Trooper Butler why the lieutenant had
> asked for the changes, which I thought were appropriate based on my years of
> experience, that I could lay it out for him and he would go, "If he had put it
> like that, I would have understood," or, "I see what you're talking about, but
> that's not the way Lieutenant Baxter explained it to me," but I got nothing.[27]

Instead, Kilpatrick found plaintiff to exhibit irrationally:

> A: He couldn't follow reasoning...I laid out several example of what I thought were
>      simple and logical and he was either unable or unwilling to accept that...couldn't
>      find way to reach reason with him.

[23] Exhibit K- Affidavit of Jessie Almore, DPS 2031; Exhibit J- Affidavit of Cordell Williams DPS 1530, 1999.
[24] Exhibit I- Affidavit of Kevin Baxter, DPS 1982-1985.
[25] Exhibit X, Portions of Louisiana State Police Manual, P.O. 219.
[26] Exhibit X, Portions of Louisiana State Police Manual, P.O. 219.
[27] Exhibit BB, Kilpatrick deposition at p. 66.

Q:  *...specific example?*

A:  ...in one of the crashes that was discussed in his grievance, there was some question, that the driver had stated the steering messed up and that Lieutenant Baxter had him about checking the steering, and he said, "It wasn't necessary. She's lying."
    ...in interviewing Butler, I said that I had no – no knowledge of whether the steering was working properly or it was not, but wouldn't the state and he be better served, if we ended up going to court on that crash, if he could testify that they checked the steering and found no malfunction in it rather than saying, "We didn't check the steering at all. And he said, "No,"...that's illogical.[28]

A:  The fact that he had listed the driver's condition as inattentive and that Lieutenant Baxter had wanted him to amend it to, "Unknown.:  And I asked Trooper Butler, you know, how he determined that she was inattentive, and his – all he said was, "She ran off the road.:  I asked him if there were any other factors, you know, and he just responded, "She ran off the road,"

    It's in my letter. In an effort to ensure he understood my questions, I asked him things like, "Was she talking on her cell phone?"

    And he said, "I don't know."

    I said, "Well, was she talking to the passenger?"

    He said, "I don't know."

    "Was she messing with the radio?"

    "I don't know."

    And I asked him – I said, "Well in fact" – since, in fact you don't know if she was doing any of these things and may or may not have been distracted, would not: - "wouldn't it have been more accurate to put "Unknown" rather than "Inattentive?"

On January 11, 2013 Maj. Kilpatrick recommended plaintiff for a second FFDE.  Again,

Capt. Davis sent job performance records (including his grievance records and his most recent

PPR) to Matrix for a threshold determination whether a FFDE was warranted.[29]  By that time,

January 22, 2013, Dr. Rostow was retired, and his partner, Dr. Robert Davis, reviewed and

_____

[28] Exhibit BB, Kilpatrick deposition at p. 36.
[29]Exhibit S- Second Pre-Fitness for Duty Report Form, DPS 2015-2019.

approved the DPS material as appropriate for FFDE.[30]  Capt. Davis ordered Butler to attend the second FFDE on January 29, 2013.[31]  Butler failed to show and was placed on administrative leave pending investigation for possible discipline for failure to attend the exam.[32]  On April 3, 2013, plaintiff was terminated.[33]

Plaintiff has sued LSP and Capt. Madden, in his individual capacity, alleging violations of the La Disability Discrimination Statute, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.§794, et seq,[34] and the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, and La. R.S. 40:2573.  Specifically, plaintiff claims that the Defendants committed the following discriminatory acts solely on the basis that Defendants perceived him as having Obsessive Compulsive Disorder: (1) unreasonably forced him to undergo ride-alongs for an extended period of time; (2) required him to submit to FFDE and improperly disseminated the results of that exam; (3) unreasonably monitored his job performance; (4) forced him to take sick leave after the 1st FFDE found him unfit; (5) ordered him to submit for a second FFDE; and (6) terminated him.

Additionally, plaintiff claims that his right to privacy under the Louisiana Constitution was violated by Captain Tom Madden by: (1) requiring him to submit to a psychological exam without just cause; (2) requesting him to submit to an examination that was excessive in scope;

---

[30] Exh. T- Emails between Captain William Davis and Cheryl Calkins at Matrix, Inc. regarding 2nd fitness for duty (DPS-

[31] Exhibit V- Captain Davis order for second fitness for duty exam (DPS 2013-2014).

[32] Exhibit GG, 03/23/13 Letter from Lt. Charles Dupuy to Butler regarding being placed on administrative leave (DPS 2314-2315).

[33] Exhibit W- Plaintiff's termination letter from State Police (DPS 1074-1083).

[34] Section 504 of the Rehabilitation Act prohibits organizations that receive federal funds, from discriminating against individuals with disabilities. 29 U.S.C. § 794(a), (b)(3)(A)(ii). Likewise, claims brought under Louisiana Employment Discrimination Law (LEDL) are analyzed using the same framework and precedent as the Americans with Disabilities Act (ADA) claims. *Tribble v. Ouachita Parish Police Jury*, W.D.La.2013, 2013 WL 1411810. Summary judgment on these ancillary claims will be addressed by Defendants ADA analysis.

(3) communicating information from the report to persons not privileged to receive that information; and (4) requiring him to submit his psychiatric records to Matrix.

Lastly, plaintiff asserts §1983 claim for alleged constitutional violations and a claim for relief under FMLA.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.

## III.    ARGUMENT

On the record submitted, plaintiff cannot establish a *prima facie* case of disability discrimination under the "perceived as" disabled theory, the only theory plaintiff asserts herein. Further, the uncontroverted evidence shows that defendants are entitled defenses of direct threat and legitimate, non-discriminatory reasons for each alleged adverse act. Plaintiff's state law claims for invasion of privacy and §1983 claims arising from the 1st FFDE (February 8, 2011)

are prescribed as they occurred more than one year prior to the filing of this lawsuit. Such claims alleged to arise from later events fail on the merits, even when the facts are viewed in a light most favorable to the plaintiff. Regarding the FMLA, plaintiff failed to produce any evidence that he requested, but was denied FMLA leave by DPS and this is an essential element of the claim for relief under the FMLA 'involuntary-leave theory' plaintiff asserts herein. Plaintiff's legal challenge under the Peace Officer's Bill of Right has no application here, as will be briefed more fully in DPS opposition to Plaintiff's Motion for Partial Summary Judgment [Doc. 52]. Lastly, Defendants show that Capt. Madden is entitled to qualified immunity. In the absence of genuine issue over of any material facts, Defendants are entitled to dismissal with prejudice at plaintiff's costs.

## A. <u>AMERICANS WITH DISABILITIES ACT DISCRIMINATION CLAIM</u>

As part of his *prima facie* case for alleged ADA violations, Plaintiff must establish that he suffered a "qualified disability" as defined by applicable federal regulations and existing caselaw.[35] Butler fails to meet this threshold requirement, and therefore, his claims for discrimination should be dismissed.

The ADA makes it unlawful for an employer to discriminate against a qualified employee with a disability because of that employee's disability.[36] The McDonnell Douglas framework is applicable to "perceived as ADA cases."[37] Pursuant to that framework, a plaintiff must first make a *prima facie* showing of discrimination by establishing that: (1) he is disabled or is regarded as disabled within the meaning of the Act; (2) he is qualified for the job; and (3) he was subjected to an adverse employment action on account of his disability.[38] If a plaintiff makes

---

[35] 29 C.F.R. § 1630.2(i), et seq.
[36] 42 U.S.C. § 12112(a) (2000).
[37] *McInnis v. Alamo Community College Dist.*, 207 F.3d 276 (5th Cir. 2000).
[38] *Id.* at 279-280.

this *prima facie* showing, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.[39]  Once the employer articulates such a reason the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the reason was merely a pretext for discrimination.[40]

### 1.  Plaintiff Is Not "Disabled" Within The Meaning Of The ADA

The statutory definition of "disability" includes having or "being regarded as having [a physical or mental impairment that substantially limits one or more of the major life activities."[41] The EEOC regulations state that "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[42]  Plaintiff claims that DPS regarded him as being substantially limited from the major life activity of working.  For the major life activity of working, the EEOC regulations provide that:

> "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. **The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.[43]**

As a threshold matter, Plaintiff has the burden of showing that his impairment or perceived impairment extends beyond one job to a class of jobs or abroad range of jobs in various classes.[44]    In this case, the record demonstrates that Defendant believed plaintiff incapable of performing the duties of only one job - a LSP Trooper.

---

[39] *Id.*
[40] *Id.*
[41] See 42 U.S.C. § 12102(2)(C).
[42] 29 C.F.R. § 1630.2(i).
[43] 29 C.F.R. § 1630.2(j)(3)(i). (emphasis added)
[44] *Winborne v. Sunshine Health Care, Inc,* 2010 WL 4643251 (5th Cir. 2010).

The case of *Daley v. Koch*[45] involves facts nearly identical to this case, and the US Second Circuit Court of Appeal found in favor of NYPD on a perceived disability case when plaintiff was only being restricted from a narrow range of jobs, and therefore, was not disabled within the meaning of the ADA.[46] The *Daley* plaintiff underwent a psychological screening as part of his application to become a police officer. The Police Department psychologist opined plaintiff had poor judgment, irresponsible behavior and poor impulse control.[47] The psychologist found Daley unsuitable to be a police officer. Despite Daley submitting his own psychiatrist's report which stated that Daley had no undue anxiety which would prevent him from working as a police officer, US Second Circuit Court of Appeal rejected his ADA claim on the following grounds:

> the [ADA] regulations cannot be interpreted to extend this definition [of qualifying disability] to include working at the specific job of one's choice. The position of New York City police officer demands unique qualifications that appellant has failed to meet. **Being declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity.** "Several courts have decided 'unanimously that an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job.'"[48]

In this case, DPS believed plaintiff was incapable of satisfying the only singular demands of his particular job as a LSP Officer. The job performance observations upon which the 1st and 2nd referrals for FFDEs were made are specifically directed at plaintiff's inability to perform as a LSP Trooper, not an inability to work a broad class of jobs. Butler was noted to be unable to grasp and properly apply the concept of probable cause, but this deficiency is irrelevant outside of specific non-law enforcement work. DPS recognized plaintiff's failure to properly handle and

---

[45] 892 F.2d 212 (2nd Cir. 1989).
[46] Id.
[47] 892 F.2d at 214.
[48] Id at 215 (citing *Forrisi v. Bowen*, 794 F.2d 931, 934-35 (4th Cir.1986)).(emphasis added)

13

secure weapons as an inability to perform the functions of a LSP Trooper, but not necessarily as an inability to perform most other jobs in our society.   In recommending plaintiff for the 1st FFDE, DPS highlighted his patterns of compulsive behavior, but did so only to illustrate how it might "impede his professional decisiveness and situational awareness," deficiencies which DPS reasonably believed rendered him incapable of performing as LSP Trooper.[49]   Similarly, Butler's immediate supervisors at Team C and E expressed their concern that Butler seemed incapable of performing the duties of a trooper because he likely would not react properly if put in a hostile situations where quick decisions had to be made.

Dr. Rostow described in his discovery deposition the nature of the job as distinguished from others as follows:  "State troopers are armed and engage in public safety activity.  They have a responsibility over and above the rest of us to function in a useful, appropriate manner."[50]

Capt. Madden's articulated well in his discovery deposition how the job of a LSP officer mandates unique character traits and capabilities that Butler was not exhibiting, thereby preventing him from performing that unique job:  Madden testified as follows:

> *Q. Okay. In what way did you think Trooper Butler was a risk to officer safety?*
>
> **A.** I think, as discussed earlier today, as evidenced by working with an armed subject on the side of the road with no due regard for what can happen in those instances, whether that individual carries a concealed carry permit or not, that's concerning.  Inappropriate pat downs, that's concerning. There have been law enforcement officers shot with weapons that are concealed upon persons placed in the back of their units. There are instances where our troopers have performed heroic actions on the way home, while not in service or what have you, that I am not confident Scott is capable of processing the appropriate response.  That's just my personal ...
>
> *Q. Can you give me an example?*
>
> **A.** Ma'am?
>
> *Q. Can you give me an example?*
>
> **A.** A particular example? That Scott failed?

---

[49] Exhibit L Captain Tom Madden Recommendation for Fitness for Duty, DPS 055.
[50] Exhibit AA, Rostow Deposition Transcript, pg. 68.

*Q. When you said you were not confident that he could perform heroic actions on his way home or whatever, what heroic actions would he be expected to perform?*

**A.** We've had a shooting incident up here where a trooper's partner was disarmed, and another trooper drove upon scene and was required to take lethal action. I, myself, in the past have ended up on the top of a bridge to talk a suicidal subject down from the bridge. We've had persons in the past – vehicle overturned in a bayou there at Red Chute, where individual had to make the conscious decision to strip his uniform, go into the water -- wintertime -- rescue a subject. We have troopers on a daily basis -- well, weekly basis, that perform acts that go above and beyond in public service.

*Q. But what made you think Trooper Butler would be unable to do any of that?*

**A.** As elementary as his inability to complete a crash report; the evidence of once upon challenged at issuing a citation, he chooses not to; the ability to follow simple direction, to stand in front of a video camera; his lack of self assurance. This job requires -- in order to protect you and the rest of the public, this job requires decision-making; and we have witnessed a lack of that and an inability for Scott to be self confident in his actions, up to and including reading VIN numbers on vehicles and interacting with the public.[51]

Clearly, DPS and Capt. Madden only concerned themselves with plaintiff's incapacity to perform the job of LSP officer.

Under the law, LSP officer is considered a narrow range of jobs and does not meet the definition of ADA disability. The case of *Winborne v. Sunshine Health Care, Inc.* provides insight on the type of evidence required to establish that an employer perceived an individual as being incapable of performing a broad range of jobs.[52] The plaintiff in *Winborne* was a licensed practical nurse ("LPN") at a retirement home who suffered from transient ischemic attacks ("TIAs"). The symptoms of TIAs include temporary loss of awareness, weakness, severe headaches, dizziness, and difficulty concentrating. The Winborne plaintiff allegedly failed to properly raise the side rails of a bed belonging to an elderly dementia patient and left the patient unattended. As a result, the patient fell out of her bed. The employer terminated her, and she plaintiff filed under the ADA alleging that her employer perceived her as having a disability, i.e.

---

[51] Exhibit **Z, Captain Madden** Deposition, pgs. 100-102.
[52] 2010 **WL 4643251** (5th Cir. 2010).

TIA's, preventing her from working in a broad range of jobs and submitted the following evidence in support: (1) testimony of her direct supervisor at nursing home that he was concerned about Winborne's ability to practice as a nurse, that she believed Winborne was not safe to work with patients because of her altered thinking, and that she wanted a note from Winborne's neurologist stating that Winborne was competent and safe to work as a nursery; and (2) testimony of the nursing home owner that he was concerned that the TIAs might influence Winborne's ability to work.

The *Winborne* court stated that the above evidence clearly established that the Plaintiff's supervisor and the nursing home owner were concerned about Plaintiff's ability to care for patients in her role as a treatment nurse which was a primary reason for termination.[53] However, the *Winborne* court found that Plaintiff failed meet her burden that the perceived impairment, i.e. TIA, extends beyond one job to a class of jobs or a broad range of jobs. The court stated that the Plaintiff failed to obtain and submit testimony from the supervisor or nursing home owner that they believed her TIA prevented her from performing an administrative position at the nursing home or that she was incapable of using her skills in a broad range of health care related positions.[54]

Likewise, Butler has failed to meet his burden to establish an ADA qualified disability. There is no evidence DPS or Madden believed plaintiff's Obsessive Compulsive Disorder prevented him from working beyond the one job of LSP Trooper, a job where individual law enforcement officers are traveling alone for much of their shift, sometimes in remote, rural areas of the state. The evidence dictates that the Defendant believed at all times that Butler was only

---

[53] 2010 WL at *5.
[54] *Id.*

16

incapable of performing the functions of a Louisiana State Police officer. Therefore, plaintiff has failed to establish a qualified disability under ADA and his prima facie case fails.

Out of an abundance of caution and in the event the Court finds that plaintiff establishes a prima facie case under ADA, Defendant will address the merits of plaintiff's alleged adverse employment actions and demonstrate that each employment decision was based on legitimate and non-discriminatory reasons.

### 2. DPS Was Obligated To Monitoring Plaintiff and Submitting Him to the Two FFDEs Because He Posed a Direct Threat

Plaintiff complains he was subjected to discriminatory monitoring of his behavior when he was required to undergo an orientation period/ride alongs for a longer time than others upon his return to Road Patrol in November 2010. The records reflects that plaintiff's own actions cast such doubt about his ability to perform solo that DPS would have been derelict in its public mission if it had released from ride alongs him at that time. Plaintiff claims the observation report from his peers and supervisors are defective as they were prepared by laymen, untrained in psychiatric or psychological disorders. A quick review of the daily observation reports reveals that Team C troopers were not drafting a diagnostic report, but rather were simply documenting the words and actions they actually observed plaintiff say and do. The give first-hand, not second-hand, specific accounts of observable behavior. The troopers were not speculating when they documented plaintiff handling a gun with the tips of his figures and only holding the Taser with a handful of napkins as a barrier. There is no deduction involved in the troopers notes about observing plaintiff fail to control the scene when he stopped violators or investigated a crash. Plaintiff allowed violators to dictate whether they got a ticket or not, and he managed a traffic accident investigation on the interstate so poorly, the elderly driver involved ask if he was okay.

Defendant asserts that all actions taken were warranted because Butler posed a direct threat to himself and others.

Under the ADA, an employer is relieved of liability for the "den[ial] of a job or benefit," that would otherwise violate the Act, by showing the employee posed a direct threat. 42 U.S.C. § 12113(a)-(b).  The statute defines "direct threat," as a "significant risk to the health or safety of others that cannot be eliminated by a reasonable accommodation." 42 U.S.C. § 12111(3). The ADA requires employers to conduct an individualized assessment of the [employee's] present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r).

The employer's determination that an employee poses a significant risk to health or safety must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2.  Before excluding an individual from employment as a direct threat," an employer must engage in an interactive process with the employee to determine the availability of an effective accommodation that would reduce or eliminate the treatment.[55]

In *Zulueta v. U.S.*, the Plaintiff alleged her committed an ADA violation by wrongfully regarding her as having a disability.[56]   The *Zuleuata* court determined that the government established the direct threat defense by relying on medical opinions of psychiatrists who determined plaintiff unfit for duty. Zuleuata was employed as a part-time processing clerk at the United States Postal Service.  Shortly after her employment began, Zuleuta filed a complaint of harassment alleging that her co-workers at the Postal Service threatened to kill her and blow up her house.  Her manager conducting a full investigation, and the co-workers all denied making the threats.  Zuleuta's manager recommended that the Plaintiff submit for a fitness for duty

---

[55] *Echazabal v. Chevron USA*, 336 F.3d 1023, 1028 (9th Cir. 2003)
[56] 2009 WL 1651172 (M.D. Tenn. 2009).

examination based upon the serious claim that her co-workers wanted to kill her and destroy her property.

The *Zuleuta* plaintiff underwent a fitness for duty examination by Dr. W. Lassiter who found she was not fit for duty because she exhibited paranoia that had a potential to deteriorate while at work. Dr. Lassiter also found that Plaintiff's work environment may de-stabilize because of her condition, overall causing a further unpleasant work environment to her and co-workers as well. A fitness for duty exam was conducted several days later by Dr. Gregg Kyser who likewise found that the Plaintiff was not fit for duty because she had a psychotic disorder of chronic duration. Kyser recommended ongoing psychiatric treatment for the Plaintiff.

The *Zuleuta* court stated that it is clear that the Postal Service believed that Plaintiff had a mental impairment that substantially limited her ability to work as a mail processor and derived this belief from the results of the two fitness-for-duty evaluations.[57] The court further stated that the burden is on the plaintiff to establish that the employer did not reasonably rely on the results of those two examinations in determining whether she constituted a direct threat. The *Zuleuta* plaintiff failed to meet that burden and the Court granted Defendant's motion for summary.

In this case, DPS was presented with specific, reliable evidence plaintiff posed a potential risk and on that basis, and that basis alone, DPS ordered plaintiff to submit for the 1st FFDE. DPS did not take any adverse personnel action against plaintiff on its own. They relied on a competent medical professional to determine his fitness for duty. Only after Butler was determined to be unfit by a licensed police psychologist, Dr. Rostow, did DPS relieve him of duty in February, 2011.

In his discovery deposition, Dr. Rostow testified that a fitness for duty examination is defined as the following:

---

[57] *Zuleuta*, 2009 WL at *8.

a specialized inquiry by a specifically qualified mental health professional in response to credible reports of an employee's inability to perform essential job-related duties in a safe and/or necessary and sufficient manner because of what may be thought of as the burden of a medical or mental illness or defect of a public safety executive or official of comparable authority or experience.[58]

Dr. Rostow's report clearly states his conclusion in February 2011 that Butler has an underlying psychiatric disorder and is in need of further psychiatric treatment before returning work.[59]

In addition to the above reliable medical evidence, DPS utilized objective evidence when performing its individualized assessment of whether Plaintiff imposed a direct threat. DPS had multiple different officers ride along with plaintiff to consider a more complete and objective picture of his job performance. Likewise, Rostow conducted empirical testing on the plaintiff in his FFDE and such testing is, by nature, individualized.

It is common sense to recognize that police officers are often presented with unforeseen, hostile situations that require clear, decisive decisions. The documented job performance observed obligated DPS and Capt. Madden to act because it was clear plaintiff was struggle with decision making and if presented with the very real possibility of a hostile encounter, he could likely injury himself and/or other members of the public. Plaintiff's posed a direct threat, and defendant was warranted monitoring him, ordering him for the FFDEs.

### a. Business Necessity Warranted DPSs Actions

Although Defendants satisfy their burden for Summary Judgment on grounds of direct threat, the alternative defense, business necessity, is likewise dispositive. The affirmative defense of business necessity addresses whether the policy of requiring Louisiana State Police Officers to submit for Fitness for Duty Examinations can be justified as an across-the-board requirement.[60]

---

[58] Exhibit C, pgs. 21-22.
[59] Exhibit P, Dr. Rostow 02/08/11 report, DPS 065-066.
[60] *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871 (5th Cir. 2000).

To show a business necessity defense, a defendant must prove by a preponderance of the evidence that its qualification standards (in this case the Fitness for Duty Examination) are: (1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation.[61]   The Fifth Circuit in *E.E.O.C. v. Exxon Corp.* explained:

> In evaluating whether the risks addressed by a safety-based qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence. The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example. In short, the probability of the occurrence is discounted by the magnitude of its consequences.[62]

Courts have routinely held that a Fitness for Duty examination is a business necessity.  In

*Brownfield v. City of Yakima*, the Court held that:

> Police officers are likely to encounter extremely stressful and dangerous situations during the course of their work.  When a police department has good reason to doubt an officer's ability to respond to these situations in an appropriate manner, an FFDE is consistent with the ADA.[63]

The Court in *Brownfield* held that the Police Department had reason to doubt the officer's ability to respond to hostile situations which warranted a recommendation for fitness for duty based on the following.  The plaintiff, Oscar Brownfield, was employed as a police officer with the City of Yakima Police Department.  He made numerous complaints to his supervisor about a co-worker obtaining excessive overtime and comp time.  Brownfield's supervisors met with the Plaintiff to discuss his complaints about the co-worker.  During the meeting, the Plaintiff used an expletive when stating that he needed to speak to a union representative.  He also left the meeting despite his superior officer's order to remain.  The Brownfield plaintiff also stated that he felt like he

---

[61] *Atkins v. Salabzar*, 445 Fed.Appx. 385 (5th Cir. 2000).
[62] 203 F.3d 871, 875 (5th Cir.2000).
[63] 612 F.3d 1140 (9th Cir. 2010).

was going to lose control during a traffic stop because a young child was taunting him. Additionally, Brownfield used expletives and was hostile during an interaction with another officer during field training. Finally, Plaintiff's supervisor also overheard plaintiff make comments such as it's not important anyway," "I'm not sure if it's worth it," and "It doesn't matter how this ends." The Court held that all of the above justified the fitness for duty examination.

In the instant case, Butler exhibited character traits after he returned to work from his first fitness for duty which could potentially lead to catastrophic results. In *Watson v. City of Miami Beach*, the court stated:

> In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity. Police departments place armed officers in positions where they can do tremendous harm if they act irrationally. Contrary to Watson's contention, the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries.

Dr. Rostow testified that when interviewing plaintiff in the First Fitness for duty exam, he found that Butler projects blame on others which is a part of his OCD that has not resolved.[64]  Rostow believes that this condition prevented Butler from performing the duties of a State Police officer and will continue to do so.[65]  In 2011, Butler's treating psychiatrist, Dr. Patterson, in February 2011 confirmed the diagnosis of Obsessive Compulsive Disorder which was not completely resolved and required the use of the Prescription Paxil. The uncontroverted medical evidence demonstrates that Plaintiff had continued issues with paranoid and irrational thoughts. With understanding that these issues were unresolved, Defendant continued to monitor Plaintiff when he returned to patrol in March 2011. Defendant had the right, and we dare say, the absolute obligation to watch and scrutinize Plaintiff's performance to confirm whether the OCD was "still

---

[64] Exhibit AA, Dr. Rostow Deposition Transcript, pgs. 66-67
[65] Exhibit AA, Dr. Rostow Deposition Transcript, pg. 67.

not bothersome in nature" to ensure that he was capable of performing his job, and doing so safely.

Butler also exhibited direct oppositional and irrational behavior leading up to the time of the Second Fitness for Duty exam which warranted the exam pursuant to the reasoning in *Watson*.    On December 9, 2012, Lt. Baxter met with Butler to discuss why he cited a driver as being "inattentive" in a certain crash report when the driver stated that the steering wheel locked up.    Additionally, there was evidence that the driver's vehicle had been recalled for steering malfunctions.    Butler refused to perform any further investigation on the steering wheel recall and stated that the driver was "inattentive" because she ran off the road.    Butler acknowledged that he had no proof the driver was distracted by talking on her phone, but still he insisted on listing the driver's condition as "inattentive" rather than using "unknown" as recommended by Lt. Baxter.

Butler filed a grievance against Lt. Baxter claiming that his conduct was unprofessional. Maj. Kilpatrick meet with plaintiff as part of the grievance process.    According to Kilpatrick, he laid out the thought process in a step by step way of how the Troop and Butler himself would be benefited by changing the report to read that the driver's condition was unknown rather than making the affirmative conclusion that she was inattentive.    Plaintiff could not or would not accept that it was more reasonable.    Plaintiff insisted that the driver was lying about the steering wheel malfunction.    Kilpatrick asked Butler what proof he had that the driver was lying. Given his irrational behavior, Defendant's reasonably suspected he might not be able make clear unbiased decisions if confronted in a hostile situation.    Defendants again submitted documents to Matrix for review and consideration for a second Fitness for Duty Examination.

In this case, the LSP fitness for duty exam is clearly job related and a business necessity. According to Dr. Rostow, whose report is attached as Exhibit K, the exam is specifically aimed at evaluating the ability of the examinee to perform the pressures and demands of a State Trooper.[66] Further, the fitness for duty exam is uniformly applied.  DPS contracts with Matrix a third party licensed psychiatrist to perform the exam.  Matrix has a specific protocol used for every officer, which includes reviewing documents from DPS and determining whether the exam is warranted.[67]   Butler clearly exhibited behavior which concerned DPS as to whether he could perform his job which warranted the second fitness for duty exam.

All of the elements of Business Necessity defense have clearly been met in this case which establishes a legitimate non-discriminatory reason for submitting plaintiff to the second fitness for duty exam which mandates the dismissal of his discrimination claims.

## B. INVASION OF PRIVACY CLAIM

### 1. Any Alleged "Invasion Of Privacy" Claim Related To The First Fitness For Duty Exam Is Prescribed.

Plaintiff asserts in his 1st and 2nd amended petition that the Defendants invaded his right to privacy pursuant to La. Const. Art. 1, section 5 by committing the following acts in connection with the first FFDE by requiring him to: (1) submit to a psychological exam without just cause and which was allegedly excessive in scope; (2) communicating information from the report to persons not privileged to receive that information; and (3) requiring him to submit his psychiatric records to Matrix.  Under Louisiana State law, a claim based on constitutional tort of invasion of privacy is subject to a year prescriptive period.[68]  Plaintiff filed suit May 30, 2012.  Accordingly, the evidence clearly establishes that any allegation of invasion of privacy relating to the First

---

[66] Exhibit P, Rostow 2/8/11 report, DPS 0065.
[67] Exhibit Z, Rostow Deposition transcript, pgs. 11-12.
[68] *Thomas v. State Employees Group Benefits Program*, 2005-0392 (La. App. 1st Cir. 3/24/06), 934 So.2d 753; La. C.C. Art. 3492.

FFDE conducted February 8, 2011 occurred more than one year prior to Plaintiff filing suit and is therefore prescribed.

Butler's testified that Captain Madden disseminated the results of the fitness for the duty examination during the time when he was assigned to ride with other officers on patrol.[69]  The record reflects that the majority of the time plaintiff did ride alongs before his FFDE, so    Capt. Madden could not have disseminated the results before the FFDE occurred.  Plaintiff did also have rode alongs with officers with Team C after the FFDE, but only for two weeks in March 2011 right after he returned to work.  Again, if Captain Madden disseminated the results of the exam during March 2011, which is denied by Defendants, then that alleged invasion/tort occurred more than one year before Plaintiff filed suit and the claim is prescribed pursuant to La. C.C. art. 3492.

Plaintiff claims that the Fitness for Duty exam itself was an invasion of privacy, because it was excessive in scope.  As to the first FFDE, the claim is prescribed.  As to the second FFDE, plaintiff never submitted.  Thus, he could never have suffered an invasion of privacy from it.

Alternatively, even if plaintiff had submitted for the second FFDE, he had no expectation of privacy from submitting to the complete, thorough exam DPS sought to obtain.

It is abundantly clear that law enforcement officials cannot have expectation to privacy over information which relates to their physical and mental abilities to perform their job.  In *Maryland v. King*, the U.S. Supreme Court recognized that the operational realities of the workplace may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts.[70]  The Court has also held that with respect to public employees required to carry firearms in the line of duty, successful

---

[69] Plaintiff Depo- Exhibit Y, pgs. 100-102.
[70] —— U.S. ——, 133 S.Ct. 1958, 1969, 186 L.Ed.2d 1 (2013).

performance of their duties depends uniquely on their judgment and dexterity.[71]  Therefore, these employees cannot reasonably expect to keep from [their employers] personal information that bears directly on their fitness.[72]

As explained previously, Butler's behavior established that he posed a direct threat to others, and that DPS had a business necessity for submitting him to the exams.   Any privacy interest Butler had to be free from the Fitness for Duty Exams, which the *King* Court states is diminished or non-existent, is clearly outweighed by the public's interest in being free from any officer that may employ deadly force with impaired perception or judgment.

Butler testified that the first FFDE was (and the second was anticipated to likewise be) excessive in scope, because he had to take a series of tests which revealed information that Matrix already had in its possession from a prior psychological screening.[73]  While DPS admits that it conducts a psychological screening on all LSP Cadets and had done so on Butler in 2000, seeking to gain updated psychological information at the time of the FFDE instead of relying on test result from eleven years earlier is not an invasion of privacy.   Further, plaintiff claims that the FFDE was excessive in scope, because he had to stay there for a lengthy period of time.[74] Again, there is no invasion of privacy in subjecting plaintiff to a thorough exam.

In regard to Plaintiff's claim that his privacy rights were violated by being required to submit psychiatric records to Matrix for the first and second FFDE, the case of *White v. Gilless* establishes that Butler had no right of privacy over that information either.[75]  The Plaintiff in *White* submitted for a FFDE, because she admitted to her employer that she was incapable of performing her duties in the Sheriff's department.   White's employer ordered her to submit for

---

[71] *National Treasury Emps. Union v. Von Rabb*, 489 U.S. at 672, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)
[72] *Id.* at 672.
[73] Plaintiff Depo, Exhibit Y, pgs. 64-66.
[74] Plaintiff Depo. Exhibit Y, pg. 66.
[75] 1995 WL 39524 (6th Cir. 1995).

the exam and produce her medical records to the entity that was to perform the fitness for duty examination. The *White* plaintiff claimed that her right to privacy was violated by having to produce the records.

The *White* court held that plaintiff placed her medical condition at issue by admitting that she was incapable of performing many of her assigned duties. The *White* Court further stated, "In an effort to determine the level at which White could perform her duties, or whether she was fit for duty, the Sheriff's Department had an interest in having White or her pertinent medical records examined." In the instant case, Butler's irrational actions before the first and second FFDEs were apparent and necessitated a review of his medical information by Matrix examiners. Therefore under the reasoning of *White*, DPS had an interest in determining the level at which Butler could perform and asked him to submit his psychiatric records to Matrix to make that decision.

### C.   NO FEDERAL CONSTITUTIONAL VIOLATIONS, §1983

#### 1. Butler's 1983 Claim Is Prescribed Under Louisiana Law

The prescriptive period for a §1983 claim is that of the forum state.[76] For §1983 cases brought in Louisiana federal courts, the appropriate statute of limitations is one year.[77] Butler alleges that Captain Madden violated his Constitutional right to equal protection under the Fourteenth Amendment of the US Constitution by requiring that he be monitored by his co-workers and having them submit reports on his behavior.[78] It is undisputed that the last time Butler was monitored on road patrol by other officers was in March 2011, more than one year from filing suit on June 4, 2012. Plaintiff admitted in his deposition that once he returned to work in March 2011 he rode along with other officers for only two weeks and then patrolled

---

[76] *Stanley v. Foster*, 464 F.3d 565, 568 (5th Cir.2006).
[77] La.C.C.Art. 3536; *Kissinger v. Foti*, 544 F.2d 1257, 1258 (5th Cir.1977).
[78] R. Doc. 9, pg. 8.

alone thereafter.[79]   Since Plaintiff filed suit more than one year from when Captain Madden allegedly subjected him to monitoring by his co-workers, the §1983 claim against Defendants is prescribed.

### 2. Madden is Entitled to Qualified Immunity

Alternatively, if this Court were to plaintiff has a §1983 claim that survives the prescription defense, defendants submit that such claim should be dismissed on grounds of Qualified Immunity.   When a governmental official with discretionary authority is sued for damages under §1983 and properly raises the defense of qualified immunity, the plaintiff bears the burden of rebutting that defense.[80] In ruling on a Motion for Summary Judgment based on qualified immunity, the Court first determines whether there is evidence to sustain a finding that the defendant's complained of conduct violated plaintiff's constitutional rights.[81]   If not, no further inquiry is needed and the defendant is entitled to qualified immunity.  If so, the inquiry proceeds to determine whether there is evidence to sustain a finding that under the existing circumstances, it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. If not, the defendant is entitled to qualified immunity.[82]

A plaintiff asserting an Equal Protection claim under 42 U.S.C. § 1983 based on disability discrimination is asserting an equal protection claim based on a "class of one."[83] To establish such a claim, the plaintiff must show that (1) he or she was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment."

---

[79] Exhibit Y, Plaintiff Depo Transcript, pgs. 87-88.  See also, Exhibit W- Ltr from Plaintiff's counsel to Colonel Michael Edmonson (DPS 052-053).
[80] *Young v. Akal*, 2013 WL 6326154 at *4 (W.D. La. 2013).
[81] *Id.*
[82] *Id.*
[83] *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 (5th Cir.2007).

There was clearly a rational basis for Madden to continued ride-alongs for Butler, because he exhibited officer safety concerns as previously described inter alia.

In *Wilkerson v. Shinseki*, the court stated that as long as the need to perform in an emergency is a realistic component of the job, the employer should be able to establish reasonable physical qualifications to ensure that an emergency situation can be dealt with safely and efficiently by the employee, especially in situations where the physical safety of others may be at risk.[84] Likewise, employers should be equally free to set psychological fitness for duty qualifications in such situations, and maintain systems in place to implement screening for those qualifications.

Clearly, Madden was justified in subjecting Plaintiff to the above described road patrol assignments as he felt that the manner in which he was performing his duties as a State Trooper posed a risk of danger to him and/or the public. Madden had officers documented the behavior observed on ride alongs and then, Madden reasonably used the documentation to submit the issue to Matrix – whether a FFDE was warranted.

The record fails to establish a constitutional violation. Further, the record does not support a finding that it would have been clear to a reasonable officer that Madden's conduct was unlawful in the situation he confronted.

## C. FAMILY MEDICAL LEAVE ACT CLAIM

Butler asserts on FMLA claim under the "involuntary-leave theory," alleging that LSP violated his FMLA rights by forcing him to take FMLA leave when he did not need to do so. It is undisputed that when Plaintiff was relieved of duty on 02/11/2011 LSP disguised his LOA as FMLA leave. However, the claims fail on other grounds. In order to prevail on his "involuntary leave theory," Butler must prove (1) that he did not suffer from a serious health condition and (2)

---

[84] 606 F.3d 1256, 1264-65 (10th Cir. 2010).

he lost the ability to take FMLA leave at a later date because he was forced to take FMLA for a non-qualifying condition.[85] Both elements must be proven.  For purposes of this analysis, we can skip the first element and dispose of the claim on Summary Judgment, because Plaintiff's own deposition testimony establishes he cannot meet the second element. In his discovery deposition, Butler testified that he had not attempted to take leave and was denied based on prior alleged unlawful involuntary leave.[86] Therefore, plaintiff cannot establish the second element of his FMLA interference claim and it should be dismissed.


### D.  BUTLER'S TERMINATION IS NOT AN ABSOLUTE NULLITY

The uncontroverted evidence establishes that Defendants terminated Butler, because he failed to attend the second FFDE and the order commanding appearance for that exam was justified based on the evidence presented to DPS and Matrix at that time.  Plaintiff claims the termination is an absolute nullity under the Louisiana Revised Statute 40: 2533, *et seq,* also known as the Peace Officer Bill of Rights,  because plaintiff was not allowed to review and give written response to each daily observation report at the time it was generated.  Butler violated a direct order from his superior officer.  Plaintiff has asserted this argument by way of a Motion for Partial Summary Judgment recently filed in this matter.  Defendants respectfully contend that the Peace Officer's Bill of Rights has no application to this case.  As will be more fully briefed in defendant's Opposition to plaintiff's Motion for Partial Summary Judgment, the Act is unconstitutional as applied to this case.  Furthermore, by its own terms, the protections afforded

---

[85] See *Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029, at *3-4 (6th Cir. July 17, 2000); *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir.2006).
[86] Plaintiff's Depo. Exhibit Y, pgs. 85-86.

therein only apply to officers "under investigation" with an eye toward discipline.[87]

## CONCLUSION

For the reasons provided above, Defendant clearly is entitled to summary judgment as a matter of law and respectfully requests dismissal of all of Plaintiff's claims with prejudice.

FORRESTER & CLARK
Attorneys at Law
4981 Bluebonnet Boulevard
Baton Rouge, LA 70809
Telephone: 225-928-5400
Facsimile: 225-928-7733

By: ___s/Amanda G. Clark_____
Amanda G. Clark (24432)
Erica M. Schirling (34743)
Mason C. Johnson (32168)

***ATTORNEYS FOR STATE OF LOUISIANA, THROUGH THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, OFFICE OF STATE POLICE AND CAPTAIN TOM MADDEN***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 25th day of July, 2014 a copy of the foregoing Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by the operation of the court's electronic filing system.

_s/Amanda G. Clark_____
**AMANDA G. CLARK**

_____

[87] La. **R.S. 40**:2531.