# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**SCOTT J. BUTLER**                                              **CIVIL ACTION**

**VERSUS**

**STATE OF LOUISIANA, LOUISIANA**                    **NO.: 12-00420-BAJ-RLB**
**DEPARTMENT OF PUBLIC SAFETY**
**AND CORRECTIONS, ET AL.**

## RULING AND ORDER

Before the Court are Plaintiff's **MOTIONS FOR PARTIAL SUMMARY JUDGMENT (Doc. 52, Doc. 65)** filed by Scott J. Butler, pursuant to Federal Rule of Civil Procedure 56, seeking summary judgment on his claims (1) that the termination of his employment was an absolute nullity under Louisiana Law; and (2) that after the initiation of this lawsuit, while he was still employed as a state trooper, Defendants ordered him to submit to a psychological examination that was neither job-related, nor consistent with business necessity. (Doc. 52-1 at p. 5; Doc. 65-1 at p. 5). The State of Louisiana, Louisiana Department of Public Safety and Corrections, Louisiana State Police and Captain Tom Madden, (collectively, "Defendants") oppose the motions. (Doc. 80, Doc. 88). Plaintiff filed a reply memorandum in response to one of Defendants' two memoranda in opposition. (Doc. 81).

Also before the Court is Defendants' **MOTION FOR SUMMARY JUDGMENT (Doc. 67)**, seeking an order from this Court dismissing Plaintiff's

claims against them, pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes the motion.[1] (Doc. 87). Defendants filed a reply memorandum in response to Plaintiff's memorandum in opposition. (Doc. 94).

Oral argument is not necessary. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.    Background[2]

Scott Butler ("Plaintiff") was employed as a Louisiana State Trooper by the Louisiana Department of Public Safety ("DPS"), Louisiana State Police ("LSP") from September 9, 2000, to April 3, 2013. (Doc. 65-7 at ¶ 1; Doc. 87-9 at ¶ 1). Plaintiff worked in the following divisions during his tenure with LSP: the Gaming Division from 2005 to 2010, the Intelligence Division from July 2010 to November 2010, and as a Road Trooper with Troop G from 2010 to 2013. (Doc. 87-9 at ¶ 2). On or about October 7, 2010, Plaintiff's supervisor, Sergeant Jason Turner recommended placing Plaintiff in a Field Training Program for Intelligence. (*Id.* at ¶ 4). Plaintiff then requested to transfer out of Intelligence and back to road patrol at LSP Troop G in Bossier. (*Id.*). Plaintiff's request was granted, and his transfer to Troop G became effective November 1, 2010. (*Id.* at ¶ 5).

---

[1] In his memorandum in opposition, Plaintiff also states that he is no longer pursuing his claim under the Family Medical Leave Act, his claim for violation of his Fourteenth Amendment rights under 42 U.S.C. § 1983, or his claim that Captain Madden communicated a diagnosis outside DPS/LSP. (*See* Doc. 87 at p. 31).

[2] In accordance with Rule 56.1 of the Local Rules of the United States District Court for the Middle District of Louisiana, both Plaintiff and Defendants submitted statements of undisputed material facts along with their respective summary judgment motions. (*See* Doc. 52-16, 65-7, 67-2). Both parties also submitted responses in opposition to those statements of undisputed material facts, denying or contesting some of those facts, as permitted by Local Rule 56.2. (*See* Doc. 80-1, 88-1, 87-9); Fed. R. Civ. P. 56(c). Accordingly, only certain material facts are deemed admitted for purposes of this ruling and order.

The primary purpose of a state trooper assigned to the patrol division is "to provide highway traffic services by enforcement of criminal and traffic laws in order to protect life and property." (Doc. 52-16 at ¶ 2). Initially, in accordance with standard procedures, Plaintiff was assigned to a series of ride-alongs with other troopers "to acclimate him to new procedures and technology."[3] (Doc. 87-9 at ¶ 5). The troopers from Teams C and Team E participating in the ride-alongs maintained logs, which documented Plaintiff's performance. (*Id.* at ¶¶ 6-7). The nature and content of these evaluations is disputed. However, Plaintiff's official performance evaluations through August 2012 always reflected that he was performing his duties satisfactorily. (Doc. 52-16 at ¶ 1).

On January 26, 2011, after reviewing the performance logs from Intelligence and the ride-along reports from Teams C and E, Captain Madden recommended Plaintiff participate in a psychological fitness for duty examination ("FFDE"). (Doc. 87-9 at ¶ 8).

Pursuant to DPS protocol, the Internal Affairs Division ("Internal Affairs") compiles the information that is ultimately submitted in conjunction with a FFDE referral. (Doc. 52-16 at ¶¶ 18, 19; Doc. 80-1 at ¶ 18). Internal Affairs handles specialized administrative investigations as warranted and delegated to it by the Colonel and/or the Chief of Staff of LSP. (Doc. 52-16 at ¶ 15). DPS contracts with a third party, Matrix, Inc. ("Matrix"), to conduct psychological FFDEs for LSP. (*Id.* at ¶ 17; Doc. 80-1 at ¶ 17). The FFDEs are administered by licensed psychologists

---

[3] Plaintiff does not appear to dispute that this is standard procedure generally, but he argues that his ride-along period was "extended unreasonably because of a perception of disability." (Doc. 87-9 at p. 2).

with special training and experience in police psychology. (Doc. 87-9 at ¶ 9). Internal Affairs then maintains a case file for each FFDE that is requested. (Doc. 52-16 at ¶ 16). The documents sent to Matrix are kept under the employee's name in a secure location in Internal Affairs, but separate from other records. (Doc. 52-16 at ¶ 20).

Here, pursuant to DPS protocol, the job performance documentation was first submitted to Captain William Davis, Commander of DPS Internal Affairs Division. (*Id.*). Then, Captain Davis sent the documentation to Matrix for a pre-fitness review, whereupon Matrix psychologist, Dr. Cary Rostow ("Dr. Rostow") reviewed it, and determined that a FFDE should be conducted. (*Id.* at ¶ 10). The depth of Dr. Rostow's pre-examination review of the documentation submitted to Matrix is disputed.

On February 8, 2011, Plaintiff appeared for his first FFDE at Matrix in Baton Rouge as ordered. (*Id.* at ¶ 11). During the examination, Butler submitted a February 1, 2011 letter from Theresa Stewart, ("Nurse Stewart") a certified psychiatric clinical nurse specialist with LSU Health Sciences, and Dr. James Patterson, Nurse Stewart's supervising psychiatrist. (*Id.*). The letter stated that Plaintiff was diagnosed with Obsessive Compulsive Disorder ("OCD") in November 2010, and had been under treatment for the condition. (*Id.*). The letter also stated that by January 7, 2011, "all of [Plaintiff's] compulsive behavior and obsessive thoughts had stopped" and that Plaintiff "was no longer depressed or showing symptoms of anxiety or depression." (Doc. 67-17). In Nurse Stewart and Dr.

Patterson's opinion, Plaintiff was "fit for duty." (*Id.* at p. 2). However, after conducting his own evaluation, Dr. Rostow found Plaintiff unfit for duty. (Doc. 87-9 at ¶ 12). The thoroughness of Dr. Rostow's examination and the appropriateness of the types of assessments used are disputed.

Based on Dr. Rostow's opinion, Plaintiff was relieved of duty on February 9, 2011. (*Id.* at ¶ 13). The following day, Plaintiff submitted a report from Dr. Patterson, the same psychiatrist who signed the February 1, 2011 letter, which stated that although Plaintiff was still suffering from OCD, his condition was neither severe, nor "bothersome in nature." (*Id.* at ¶ 14; Doc. 65-7 at ¶ 4). The parties disagree on the validity of Dr. Patterson's assessment of Plaintiff's fitness for duty. Nevertheless, Plaintiff returned to work at Team C on March 7, 2011. (Doc. 87-9 at ¶ 15). DPS continued to have Plaintiff participate in ride-alongs with other experienced troopers as he had before the FFDE was conducted and his leave of absence commenced. (*Id.* at ¶ 15). Plaintiff's attorney later objected to the ride-alongs, and DPS acquiesced. (*Id.*). Plaintiff was permitted to ride alone effective March 26, 2012. (*Id.*).

In the interim, Plaintiff filed a complaint of disability discrimination with the Equal Employment Opportunity Commission. (Doc. 65-7 at ¶ 5). Plaintiff then filed the instant lawsuit against DPS, LSP, and his supervisor, Captain Tom Madden, in June of 2012.[4] (*Id.* at ¶ 6). During discovery, Defendants sought a court order

---

[4] Plaintiff's Statement of Undisputed Facts misstates that the instant lawsuit was filed in May of 2012. (Doc. 65-7 at ¶ 6). Plaintiff's initial Petition was filed in the Nineteenth Judicial Court in East Baton Rouge Parish on June 4, 2012. (Doc. 1-3 at p. 1). An Amended Petition was filed on June 8, 2012. (Doc. 1-3 at p. 6). The action was removed to this Court on July 13, 2012. (Doc. 1).

compelling Plaintiff to produce his psychiatric treatment records. (*Id.* at ¶ 7). Defendants claimed Plaintiff's psychiatric records would provide proof that "Butler, in fact, suffered from a psychiatric condition" as well as prove "the extent of his psychiatric condition." (*Id.* at ¶ 8). That same November 11, 2012 Motion to Compel (Doc. 11) was still pending on January 23, 2013, the date on which Defendants ordered Plaintiff to submit to a second FFDE.[5] (Doc. 65-7 at ¶ 9).

On December 18, 2012,[6] pursuant to LSP Policy, Plaintiff filed a personnel grievance against the supervisor of Team D, Lieutenant Kevin Baxer ("Lt. Baxer"). (Doc. 52-16 at ¶ 3). Plaintiff alleged that Lt. Baxer threw a crash report at him during a December 9, 2012 meeting and that Lt. Baxer's recommended edits to reports Plaintiff wrote would have undermined the integrity of the reports. (Doc. 87-9 at p. 17). Plaintiff's next-in-line supervisor, Major Joel Kilpatrick ("Major Kilpatrick") then met with Plaintiff on January 2, 2013, to conduct a grievance review. (*Id.* at ¶ 18). The substance of their conversation during this meeting is disputed.

On January 11, 2013, Major Kilpatrick wrote Lieutenant Colonel David Staton to advise that based upon his observations of Plaintiff, that Plaintiff was either "unable or unwilling" to perform his job duties. (Doc. 52-16 at ¶ 5). Major

---

[5] Defendants assert that the filing of the Motion to Compel and the referral for a second FFDE were "two independent events," and dispute that the second FFDE was a litigation strategy. (Doc. 88-1 at ¶ 9). However, Defendants do not dispute the dates on which these actions occurred.

[6] In Plaintiff's Response to Defendants' Statement of Undisputed Facts, he admits the date of the grievance as December 19, 2012. (Doc. 87-9 at ¶ 17). However, the document in the record lists the date of the grievance letter as December 18, 2012, with a mailing date of December 19, 2012. (Doc. 80-2 at p. 30).

Kilpatrick's motivations for making this statement are disputed. (*Id.*; Doc. 80-1 at ¶ 5). In his letter, Major Kilpatrick also recommended that Plaintiff be sent for a second psychological FFDE "for determining [the] Department's most appropriate course of future action." (Doc. 52-16 at ¶ 6). Plaintiff was not provided a copy of the letter, nor given an opportunity to read it. (*Id.* at ¶ 7). Defendants dispute that Plaintiff was entitled to read the letter. (Doc. 80-1 at ¶ 7). Major Kilpatrick had no interaction with Plaintiff after the January 2, 2013 meeting. (Doc. 52-16 at ¶ 9).

Between the grievance meeting on January 2, 2013, and the date of Major Kilpatrick's letter, January 11, 2013, no one reported any bizarre, unusual, or illogical behavior by Plaintiff to Major Kilpatrick. (*Id.* at ¶ 10). Major Kilpatrick did not consider any alternative to a FFDE for Plaintiff, (*Id.* at ¶ 11), though it is disputed that consideration of alternatives was warranted. (Doc. 80-1 at ¶ 11). Plaintiff was not relieved of duty and continued to perform the normal duties of a state trooper while Major Kilpatrick's FFDE recommendation was pending with Internal Affairs. (*Id.* at ¶¶ 12-13).

On January 23, 2013, Defendants ordered Plaintiff to report to Matrix for a second psychological FFDE. (*Id.* at ¶ 21).

In advance of Plaintiff's scheduled psychological examination, Defendants once again submitted materials about Plaintiff to Matrix for its psychologist, Dr. Robert Davis' review. (Doc. 65-7 at ¶ 15). A memo from Assistant Secretary Kathy D. Williams ("Williams Memo") was among the documents submitted to Matrix prior to January 29, 2013. (*Id.* at ¶ 16). The parties dispute whether that

disclosure was intentional. (Doc. 88-1 at ¶ 16). Though the Williams Memo was in Dr. Davis' possession at the time he agreed to schedule Plaintiff's evaluation, there is no affirmative evidence that he did, or did not review it. (*Id.* at ¶ 17; Doc. 65-7 at ¶ 17). At the time the Williams Memo was submitted to Dr. Davis and the second FFDE was scheduled, Plaintiff had already filed the instant lawsuit against Defendants. (Doc. 65-7 at ¶ 18). The Williams Memo contained defense counsel's mental impressions, conclusions, opinions and legal theories prepared in anticipation of litigation. (*Id.* at ¶ 19). The relevance of the memo is disputed. (*Id.* at ¶ 20; Doc 88-1 at ¶ 20).

Major Kilpatrick's January 11, 2013 letter was also among the documents provided by Defendants to Matrix for purposes of having Plaintiff referred for a FFDE. (Doc. 52-16 at ¶ 25). One of the questions posed by Matrix to the employer prior to conducting the FFDE was: "If the FFDE finds that the employee is fit for duty, would you return the employee to his/her current position or would you discipline the person for his/her actions." (*Id.* at ¶ 26). In response, Captain Davis indicated "refer for discipline," based upon information he had received from his command staff, and/or the LSP Chief of Staff. (*Id.* at ¶¶ 26-27).

Ultimately, Dr. Davis was retained to provide expert testimony in this case. (Doc. 65-7 at ¶ 14). It is undisputed that Defendants intended Dr. Davis to function "as an independent medical examiner who reviews records from another party and considers such records plus their own observations to render opinion testimony."

(Doc. 65-7 at ¶ 22).  However, the date of Dr. Davis' retainer is in dispute.  (Doc. 65-7 at ¶ 14; Doc. 88-1 at ¶ 14).

After receiving the FFDE order, Plaintiff objected, through counsel, to its demands.  (Doc. 52-16 at ¶ 28).  The FFDE order required Plaintiff to submit medical, psychological, psychiatric, and pharmacological records, to authorize the evaluator to submit a written report to LSP, and to waive his right to review the FFDE report.  (*Id.* at ¶ 22).  Defendants contend that this procedure is imposed by Matrix because of concerns regarding doctor-patient confidentiality.  (Doc. 80-1 at ¶ 22).  As a result, Defendants refused to withdraw or modify the order and threatened a penalty, up to and including termination.  (*Id.* at ¶ 29).  Plaintiff did not obey the order.  (*Id.* at ¶ 30).  When he failed to show for the examination, Plaintiff was placed on administrative leave pending investigation for possible discipline for failure to attend the exam.  (Doc. 87-9 at ¶ 21).

On April 3, 2013, Defendants terminated Plaintiff's employment because he did not obey the FFDE order.  (Doc. 52-16 at ¶ 31; Doc. 87-9 at ¶ 22).  Plaintiff appealed to the State Police Commission, which has stopped proceedings pending the outcome of Plaintiff's federal lawsuit.  (Doc. 52-16 at ¶ 32).

## II.  Standard of Review

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether the movant is entitled to summary judgment,

the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Houston Independent School District*, 113 F.3d 528, 533 (5th Cir. 1997).

After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). At this stage, the court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). However, if the evidence in the record is such that a reasonable jury, drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor, the motion for summary judgment must be denied. *Int'l Shortstop, Inc.*, 939 F.2d at 1263.

On the other hand, the non-movant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In other words, summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact, and

that the moving party is entitled to judgment as a matter of law." *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

## III. Discussion: Plaintiff's Motions

### A. State Law Nullity Claim

Plaintiff asserts that his termination is an absolute nullity under Louisiana law because it violates a collection of statutes, entitled "Rights of Law Enforcement Officers While Under Investigation," also known as the Peace Officer Bill of Rights. *See* La. R.S. 40:2531-2535; La. Civil Code art. 7. Plaintiff further avers that he is entitled to such protections because: (1) he is a police employee who was "under investigation with a view to possible disciplinary action," pursuant to La. R.S. 40:2531(A); (2) LSP placed written adverse comments in his Internal Affairs file without first permitting him to read and respond, in violation of La. R.S. 40:2533; (3) the adverse comments were used in evaluating him and ordering him to submit to a psychological FFDE, (4) he objected to waiving his rights with respect to the FFDE examination; and (5) LSP unlawfully penalized him for asserting his rights by terminating his employment, in violation of La. R.S. 40:2535. (Doc. 52-1 at pp. 9-10).

Even assuming that Plaintiff is correct that these are the applicable elements, he fails to demonstrate that there are no genuine disputes of material fact with respect to those elements. First, Defendants' vehemently contest that Plaintiff was "under investigation with a view to possible disciplinary action." (Doc. 80 at pp. 7-13). Instead, they assert that their actions were taken on "a reasonable suspicion

of a mental health impairment," (Doc. 80 at p. 8), and no investigation began until after Plaintiff's failure to show for his second FFDE. (*Id.* at p. 9). In support, they point to deposition testimony from Major Kilpatrick and Captain Davis that highlight the difference between assessing psychological fitness and assessing policy violations. (*Id.* at pp. 8-10). In his deposition, Captain Davis also testified that a set procedure is followed in opening administrative investigations, which is initiated by Colonel Michael Edmonson or his Chief of Staff. (*Id.* at p. 10). That procedure was not initiated with respect to Plaintiff until after he failed to attend the second FFDE. (*Id.*). Given this, Plaintiff's assertion that "[i]t cannot be disputed that Butler was under investigation," (Doc. 52-1 at p. 13), is incorrect. Accordingly, a genuine dispute of material fact exists regarding whether or not Plaintiff was "under investigation with a view to possible disciplinary action." Resolution of this factual dispute is a necessary predicate to ascertaining whether the statute in question is applicable to the instant facts at the summary judgment stage. On this basis alone, summary judgment must be denied.

Additionally, in the alternative, Defendants dispute the constitutionality of the application of the Peace Officer's Bill of Rights in the instant case. (Doc. 80 at pp. 16-20). However, because there are factual issues that must be resolved to determine whether or not the statute does in fact apply (i.e., whether Plaintiff was

"under investigation with a view to possible disciplinary action"), the Court need not address Defendants' constitutional argument here.[7]

Accordingly, given the existence of material issues of fact, Plaintiff's motion for partial summary judgment (Doc. 52-1), and Defendants' cross-motion for summary judgment on this issue, must be **DENIED**.

## B. Rehabilitation Act of 1973

Defendants begin their opposition to Plaintiff's motion by asserting that Plaintiff is ineligible for coverage under 42 U.S.C. § 12112(a) because he does not have a "qualifying disability." (Doc. 88 at pp. 3-4). However, this point is contrary to well-established law.

The Rehabilitation Act of 1973 prohibits employment discrimination against a "qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). The United States Court of Appeals for the Fifth Circuit has summarized that to qualify for relief under the Rehabilitation Act, a plaintiff must prove that he: (1) is an "individual with a disability"; (2) is "otherwise qualified" for the job; (3) worked for a "program or activity receiving Federal financial assistance"; and (4) suffered discrimination "solely by reason of her or his disability." *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997).

At present, the terms "disability" and "individual with a disability" under the Rehabilitation Act are defined by reference to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102. Under the ADA, a "disability" includes (1) "a physical or

---

[7] As an aside, the Court finds the State of Louisiana's constitutional challenge of the statute in question, which was enacted nearly twenty years ago and superficially amended in the Legislature's most recent session, extremely questionable.

13

mental impairment that substantially limits one or more of the major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). A party is "regarded as having such an impairment" if the party can show that his or her employer "'entertain[ed] misperceptions about the individual - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.'" *Tyler v. La-Z-Boy Corp.*, 506 F. App'x 265, 267-68 (5th Cir. 2013) (quoting *Kemp v. Holder,* 610 F.3d 231, 237 (5th Cir. 2010) and *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999)).

Importantly, "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013). "To that end, the [2008 Amendments to the ADA] primarily focus[] on broadening the definition of 'disability.'" *Id.* Thus, an individual can establish the "disabled" element of the prima facie case by showing that he or she was subject to an action prohibited by the ADA "because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added).[8]

---

[8] Defendants urge that Plaintiff must show that his impairment or perceived impairment substantially limited him from a major life activity. (Doc. 88 at p. 4; Doc. 67-1 at p. 12). However, Defendants rely on case law that is not current. The ADA was amended on September 25, 2008, with an effective date of January 1, 2009. ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008). After these amendments, such a showing is no longer required. *See* 42 U.S.C. § 12102(3)(A); *Mendoza v. City of Palacios*, 962 F. Supp.2d 868 (S.D. Tex. 2013) (in "regarded as" cases, a plaintiff now need only show that his employer perceived him as having an

Plaintiff contends that Defendants engaged in a number of discriminatory acts, which evidenced a perception by Defendants that Plaintiff was disabled.[9] (Doc. 87 at pp. 8-29).  For example, Defendants asked Plaintiff whether he had been under the care of a physician or prescribed medication "for anything such as OCD." (Doc. 87 at p. 13).  They also inquired about whether Plaintiff had "some type of germ phobia or was paranoid in any way."  (Doc. 67-8 at p. 5).  In the performance evaluations of Plaintiff by his ride-along partners, he was also described as "robotic like and nervous," "kind of 'awkward,'" and "skiddish."  (Doc. 67-10 at pp. 12-13). Additionally, much of the performance evaluation feedback centered around suspected "touch issues."[10]  Viewing the facts in the light most favorable to Plaintiff, the Court finds that given Defendants' actions during the relevant period, Plaintiff has presented sufficient evidence to establish a genuine dispute of material fact from which a jury could conclude that Defendants regarded him as disabled.

With respect to the instant claim, Section 1211(d)(4)(A) of the Americans with Disabilities Act governs "medical examinations and inquiries."  Under this provision, an employer is expressly permitted to require a medical examination and to make inquiries of an employee as to whether that employee is an individual with

impairment; he is not required to show that he is substantially limited in a major life activity, as is still required to meet the other two definitions of "disability").

[9] Specifically, Plaintiff contends that Defendants (1) subjected him to prohibited medical inquiries in 2010 and psychological examinations in 2011 and 2013; (2) used discriminatory standards, criteria and methods of administering his orientation; (3) segregated him from other troopers; and (4) coerced him to submit to a second psychological examination in January 2013, retaliated against him by threatening termination, and then terminated his employment when he objected.  (Doc. 87 at p. 9).

[10] See, e.g., (Doc. 67-10 at p. 10) (stating that "it is apparent that [Plaintiff] does not really like to 'touch' the violator's paperwork); (Id. at p. 11) (observing Plaintiff "actually touching insurance and registration paperwork on his stops….. 'In a normal fashion'").

a disability or as to the nature or severity of the disability, if the examination or inquiry is shown to be job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A). A plaintiff cannot succeed on a claim under Section 12112(d) unless the employer obtained the medical information that was disclosed through an entrance exam or disability-related inquiry. *Franklin v. City of Slidell*, 936 F. Supp.2d 691, 711 (E.D. La. 2013) (citations omitted). Additionally, a plaintiff must allege that he suffered a tangible injury due to the disclosure of the protected medical information. *Id.*

Here, Plaintiff argues that Defendants exceeded the scope of permissible examination by ordering him to submit to a FFDE conducted by an expert witness the employer retained to provide testimony against him in his pending case. (Doc. 65-1 at p. 15). Plaintiff further asserts that Defendants attempted to use the second FFDE to circumvent the discovery process.[11] (Doc. 65-1 at p. 16). Thus, according to Plaintiff, the examination was "litigation related," not job-related. (*Id.*).

In support, Plaintiff cites to Defendants' Memorandum in Opposition to Plaintiff's Motion to Compel (Doc. 56), wherein Defendants acknowledged that Dr. Davis "was specifically retained to offer expert testimony in this case," citing their Initial Disclosures of August 17, 2012. (Doc. 56 at p. 4 n.7). Had Dr. Davis's name been included in that list, Plaintiff may have had sufficient evidence to confirm his version of the timeline. However, Defendants' motion misstated the facts. Dr. Davis' name was not included in Defendants' Initial Disclosures of August 17, 2012.

---

[11] Specifically, Plaintiff avers that Defendants used the FFDE to obtain mental health treatment and prescription records that Defendants were "having difficulty obtaining through legitimate litigation discovery process." (Doc. 65-1 at p. 16).

(*See* Doc. 56-3).   Therefore, Plaintiff has not offered any affirmative evidence to confirm the Defendants' retention of Dr. Davis as an expert prior to the second FFDE.   Plaintiff's focus on the circumstances surrounding the submission of the Williams Memo as part of the second FFDE request is equally unavailing, as it fails to substantiate his assertion that Dr. Davis was a retained expert prior to the January 2013 FFDE.  (*See* Doc. 65-1 at p. 8).

In opposition, Defendants do not dispute that they received medical information about Plaintiff through a disability-related inquiry, nor do they dispute that Plaintiff's employment was terminated for failure to follow an order requiring him to submit to the second FFDE.  (*See* Doc 88).   However, Defendants contend that the examination was job-related and consistent with business necessity.  (*See* Doc. 88 at p. 6; Doc. 67-1 at pp. 17-24).  Defendants also dispute the timing of their retention of Dr. Davis as an expert witness for this matter.  (Doc. 88 at p. 7-8). Curiously, Defendants do not provide the exact date of Dr. Davis' retention, but instead point to an April 17, 2013 email from their attorney notifying Plaintiff's counsel of their intent to use Dr. Davis as a trial expert in this case.  (*Id.* at p. 8 n.10).

Because the resolution of this timing dispute is critical for resolving whether Defendants' actions were job-related and consistent with business necessity, Plaintiff's motion for partial summary judgment (Doc. 65-1) must be **DENIED**.

**IV.  Discussion: Defendants' Motion**

    **A.  Americans With Disabilities Act**

        **i.  Discrimination under the ADA**

The Americans with Disabilities Act (ADA) provides that no covered employer shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to the hiring, advancement, or discharge of employees. 42 U.S.C. § 12112(a). When considering a motion for summary judgment in cases involving a claim of discrimination in violation of the ADA, courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires that the plaintiff first establish a prima facie case of discrimination. *See McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279-280 (5th Cir. 2000) (citing *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995)).[12] Accordingly, the defendant may satisfy its burden on summary judgment by showing that plaintiff has failed to establish a prima facie case of discrimination. *See Hammond v. Jacobs Field Servs.*, 499 F. App'x 377, 380 (5th Cir. 2012) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). To preclude summary judgment, a plaintiff must then produce sufficient evidence that, when considered in the light most favorable to the plaintiff, would allow a "reasonable trier of fact to find" that a prima facie case of discrimination exists. *Deas v. River West, L.P.*, 152 F.3d 471, 476 (5th Cir. 1998). Once the plaintiff makes his prima

---

[12] Under this framework, a plaintiff must establish that: (1) he is disabled or is regarded as disabled; (2) he is qualified for the position; and (3) he was discriminated against because of his disability. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (citing *Gonzales v. City of New Braunfels*, 176 F.3d 834, 836 (5th Cir. 1999)).

facie showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Once the defendant articulates such a reason, the burden then shifts back to the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination. *Id.* (citing *Daigle*, 70 F.3d at 396).

Here, Defendants challenge Plaintiff's ability to establish a prima facie case of disability discrimination under the "regarded as" disabled theory. (Doc. 67-1 at p. 10). Defendants further contend that even if Plaintiff has established a prima facie case of discrimination, their actions were warranted as a "business necessity" and because Plaintiff posed a "direct threat." (Doc. 67-1 at pp. 16-17; Doc. 94-1 at pp. 4-5). Defendants would have the burden of proving these defenses at trial, and so, with respect to these issues, Plaintiff need only show that a genuine issue of material fact is in dispute or that Defendants have not substantiated an essential element of their affirmative defense. Further, Plaintiff need not offer all of the evidence supporting his case, but "only enough evidence from which a jury might return a verdict in [his] favor." *Int'l Shortstop, Inc.*, 939 F.2d at 1264 (internal quotations omitted).

For the reasons outlined previously, the Court is satisfied that Plaintiff has established the first element of the prima facie case – that Defendants regarded Plaintiff as disabled. Thus, to avoid summary judgment, Plaintiff need only demonstrate that he is qualified for the position, and he was discriminated against because of his disability. *Jenkins*, 487 F.3d at 315 (citation omitted).

A qualified individual is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Essential functions are "fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." 29 C.F.R. §1630.2(n)(1). In assessing whether an individual is qualified, the ADA requires that consideration be given "to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

Defendants contend that Plaintiff cannot establish the second element of the prima facie case because he could not perform the essential functions of his position as a law enforcement officer, and thus is not a "qualified individual" within the meaning of 42 U.S.C. § 12111(8). (Doc. 94 at pp. 6-11). In support, Defendants point to several incidents where Plaintiff allegedly failed to follow procedure while making various patrol stops.[13] Defendants also contend that in addition to their own evaluation, they "reasonably relied upon medical evidence to confirm [their] assessment." (Doc. 94-1 at p. 8). By contrast, Plaintiff contends that he was a qualified individual because he received satisfactory evaluations in the weeks leading up to his first FFDE, as well as after he was permitted to ride alone in

---

[13] Defendants contend that Plaintiff "failed to properly secure weapons on multiple occasions," (Doc. 94-1 at p. 7), though they only point to two instances: (1) on December 10, 2010, the Plaintiff did not move a knife outside of the suspect's grab area during a mock traffic stop, (Doc 67-5 at p. 4); and (2) on December 15, 2010, Plaintiff removed the gun of a man with a concealed-carry permit who had been stopped for speeding, but then ultimately returned the unloaded gun back to its owner. (Doc. 67-10 at p. 8). In the latter incident, Plaintiff was chastised for handing the weapon back because the owner could "have a bullet in [his] pocket." (*Id.*). Defendants also point to the need to instruct Plaintiff to turn on his cruiser lights when stopped on the highway, and Plaintiff's tentative driving while leaving the scene of an accident. (Doc. 67-10 at pp. 10-12).

March of 2011. Moreover, he continued to work as a road trooper until January 29, 2013, the date of his second FFDE. (Doc. 87 at pp. 7 n.3, 10-12). In further support, Plaintiff points to testimony from Major Kilpatrick's deposition that after interacting with Plaintiff in early January 2013, Major Kilpatrick did not feel that Plaintiff posed an immediate threat, nor did Plaintiff need to be removed from patrol. (*Id.*) (citing Doc. 53-5 at pp. 6-7).

A genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Under this standard, the Court finds that Plaintiff has alleged sufficient facts to establish a genuine issue of material fact from which a jury could conclude that he was qualified to the perform the essential functions of the job.

Plaintiff was employed as a Louisiana State Police officer from September 9, 2000, to April 3, 2013. (Doc. 67-1 at p. 1). Starting in November 2010, Plaintiff was transferred to Troop G under the command of Captain Madden. (*Id.* at p. 2). Initially, in accordance with standard procedures, Plaintiff was assigned to a series of ride-alongs with other troopers "to acclimate him to new procedures and technology." (*Id.* at p. 3). The troopers participating in the ride-alongs maintained logs which documented Plaintiff's performance. (*Id.*). Those evaluations contained mixed assessments of Plaintiff. While Plaintiff's effectiveness and strengths were noted on several occasions,[14] his deficiencies were noted on others.[15] However, in

---

[14] *See, e.g.,* (Doc. 67-4 at p. 4) (noting that Plaintiff "did not display any [noticeable] officer safety issues"); (Doc. 67-8 p. 10) (noting that Plaintiff "had a very good attitude and his appearance was excellent"); (Doc. 67-10 at p. 12) (observing that Plaintiff "made good decisions on who he released (elderly lady who recently had cancer and said seatbelt was uncomfortable, a Trooper's mother for

the months leading up to Defendants' recommendation that Plaintiff submit to a FFDE, there was no clear indication that Plaintiff was not qualified for the position. Indeed, on several occasions, Plaintiff's co-workers noted his improvements,[16] and opined that although Plaintiff possessed some shortcomings, they could easily be surmounted with additional training or more experience.[17]

After the January FFDE, Dr. Rostow determined that Plaintiff was not fit for duty, so he was relieved on February 9, 2011. (Doc. 67-1 at p. 5). However, on the same day, Defendants received a call from Plaintiff's psychiatrist Dr. James Patterson, ("Dr. Patterson") who stated that Plaintiff was fit for duty. (*Id*. at p. 6). As a result, Plaintiff was reinstated and returned to work on March 7, 2011, where he continued to conduct ride-alongs with other troopers. (*Id*.). Effective March 7, 2012, Plaintiff was permitted to ride alone. (*Id*.). Defendants continued to evaluate Plaintiff's performance, and Plaintiff continued to receive mixed reviews, but

---

speeding, and the Bossier Parish Sheriff's mechanic) which I believed that he used some discretion and common sense"); (*Id*. at p. 11) (stating that Plaintiff "did a good job"); (*Id*. at p. 12) (noting that Plaintiff was "very professional," had good officer safety, and there were no real issues); (*Id*.) (noting that Plaintiff "maintained his officer safety and had no problem 'handling' the necessary paperwork").

[15] *See, e.g.*, (Doc. 67-10 at p. 4) (Plaintiff's "sobriety testing was terrible); (*Id*. at p. 14) (stating that Plaintiff's "decision making skills are at best 'very low'"); (*Id*. at p. 2) (failing to engage his belt microphone on multiple occasions); (*Id*.) (spending an "unreasonable amount of time" investigating minor accidents).

[16] *See, e.g.*, (Doc. 67-10 at p. 10) (noting that Plaintiff "has improved in some areas of his daily patrol efforts); (*Id*. at p. 12) (stating that although Plaintiff was "kind of 'awkward,'" he "is improving").

[17] *See, e.g.*, (Doc. 67-5 at p. 4) (noting Plaintiff's observed deficiencies "are perishable skills and should improve with time on patrol"); (Doc. 67-4 at p. 4) (stating the belief that Plaintiff could "overcome the field sobriety issue [with] more guidance and with practice").

Defendants did not seek a second FFDE until January 11, 2013. (*See* 67-1 at pp. 6-8).

Thus, although Defendants characterize Plaintiff as "ticking time bomb with a real and substantial potential for harm," (Doc. 94-1 at p. 6), Plaintiff continued to work patrol for months until he was placed on administrative leave pending investigation for failing to attend his second FFDE. (Doc. 67-1 at pp. 3-9). Indeed, although Plaintiff was transferred to various teams and given different assignments at various points, in the period relevant to this litigation, his employment remained uninterrupted by Defendants except for the brief period in which he was relieved of duty after the first FFDE.[18] Accordingly, the Court concludes that Plaintiff has alleged sufficient facts to establish that he was a "qualified individual" for purposes of the ADA.

The final element of the prima facie case requires proof that the plaintiff was discriminated against because of his disability. *See Jenkins*, 487 F. Supp.2d at 1007. Stated differently, Plaintiff must prove that "an adverse employment decision was made because of his disability." *Kapche v. City of San Antonio*, 176 F.3d 840, 842 (5th Cir. 1999).

Defendants contend that "[o]ther than his termination, Plaintiff has failed to establish that he suffered any adverse employment action." (Doc. 94-1 at p. 11). In

---

[18] On February 9, 2011, Dr. Patterson called Defendants to inform them that Plaintiff was in fact fit for duty. (Doc. 67-1 at p. 6). The following day, Dr. Patterson provided written documentation asserting the same. (*Id.*). However, for unknown reasons, Plaintiff did not submit the report to the DPS until March 2, 2011. (*Id.*). Plaintiff then returned to work on March 7, 2011. (*Id.*). Defendants' suggest that Plaintiff simply "[chose] to exercise the leave of absence he had been extended by DPS," thereby implying that the decision was voluntary. (*Id.*).

opposition, Plaintiff avers that Defendants' took the following discriminatory actions against Plaintiff because of "the perception that he had a psychological impairment:" (1) subjecting Plaintiff to psychological evaluations and prohibited medical inquiries; (2) using discriminatory standards, criteria and methods of administering Plaintiff's orientation, (3) segregating and separating Plaintiff from other troopers; and (4) coercing Plaintiff to submit to a second FFDE in January 2013, "and retaliating against him by threating termination and then terminating his employment when he objected."[19]  (Doc. 87 at p. 9).  Defendants dispute that these actions constitute adverse employment actions for purposes of an ADA discrimination claim.

Under the ADA, as in the Title VII context, the Fifth Circuit has adopted a "strict interpretation of the adverse employment element." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004).  Adverse employment actions consist of "'*ultimate employment decisions* such as hiring, granting leave, discharging, promoting, and compensating.'"  *Id.* at 282 (quoting *Felton v. Polles,* 315 F.3d 470, 486 (5th Cir. 2002)).  Thus, "where pay, benefits, and level of responsibility remain the same," employment actions are typically not considered adverse.  *Watts v. Kroger Co.,* 170 F.3d 505, 512 (5th Cir. 1999).

Viewing the evidence in a light most favorable to the Plaintiff, the Court holds that a reasonable jury could find that Plaintiff suffered adverse employment actions.  First, it is well-established that termination constitutes an adverse

---

[19] Plaintiff avers that such actions violate 29 C.F.R. §§ 1630.13, 1630.7, 1630.4(a)(2), and 1630.12(a) and (b).  (Doc. 87 at p. 9).

employment action. *See Pegram*, 361 F.3d at 282. Moreover, the ADA prohibits discrimination in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112. This language is broad enough to encompass the actions Plaintiff has alleged. *See* 29 C.F.R. § 1630.4(a)(2) ("The term discrimination includes, but is not limited to, the acts described in §§ 1630.4 through 1630.14 of this part); 29 C.F.R. § 1630.13 ("[I]t is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability"); 29 C.F.R. § 1630.7 (use of "standards, criteria, or methods of administration which are not job-related and consistent with business necessity" are unlawful); 29 C.F.R. § 1630.12 (retaliation, coercion, interference or intimidation are unlawful). *See also* Interpretive Guidance to 29 C.F.R. § 1630.5 ("[I]t would be a violation . . . for an employer to limit the duties of an employee with a disability based on a presumption . . . about the abilities of an individual with such a disability.").

Because Plaintiff has produced sufficient evidence to allow "a reasonable trier of fact to find" that a prima facie case of discrimination exists, *Deas*, 152 F.2d at 476, the burden shifts to Defendants to proffer legitimate, nondiscriminatory reasons for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802.

Defendants' contend that even if the Court finds that Plaintiff has established a prima facie case of disability discrimination, their actions were justified because: (1) Plaintiff posed a direct threat and (2) business necessity warranted Defendants' actions. (Doc. 67-1 at pp. 17, 20). Indeed, Defendants assert

that DPS would have been "derelict in its public mission" had it not taken the actions complained about here. (*Id.* at p. 17).

Under the ADA, employers are permitted to raise an affirmative defense to a charge of discrimination. Specifically, an employer may impose a qualification standard that is job-related and consistent with business necessity. 42 U.S.C. § 12113(a). In addition, a qualification standard "may include a requirement that an individual shall not pose a direct threat to the health or safety of" himself or others in the workplace. *See* 42 U.S.C. § 12113(b). While these two defenses are related, they require different types of proof. "Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability." *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000) (citing 29 C.F.R. § 1630.2(r)). "In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement." *Id.* Each will be considered in turn.

To constitute a direct threat, an individual must pose a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The employer bears the burden of proving that the employee is a direct threat. *Rizzo v. Children's World Learning Ctrs.*, 84 F.3d 758, 764 (5th Cir. 1996). According to the EEOC's implementing regulations, the determination that a person poses a direct threat *shall* be based on an individualized assessment of the person's "present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r) (providing also that such assessment "shall be based on a reasonable medical judgment that relies on the

most current medical knowledge and/or the best available objective evidence" and listing four factors relevant to the determination of whether an individual would pose a direct threat).[20] *See also Rizzo*, 84 F.2d at 762-63. Moreover, "whether one is a direct threat is a complicated, fact intensive determination, not a question of law." *Id.* at 764.

Here, there is sufficient evidence for a reasonable jury to conclude that Plaintiff was not a direct threat to himself, co-workers or the public. Though his performance was being evaluated and areas of concern were documented, Defendants did not engage in an interactive process with Plaintiff to determine the availability of an effective accommodation. *See* 29 C.F.R. § 1630.2(r). Moreover, the report issued by Dr. Rostow after the first FFDE indicated that Plaintiff required "further psychiatric treatment before returning to work." (Doc. 67-1 at p. 20). Yet, there is no indication that Plaintiff received any such treatment prior to his March 7, 2011 reinstatement. Had Defendants truly believed that Plaintiff posed a threat to himself or others, it is doubtful that Plaintiff would have been permitted to resume work just as he had prior to the FFDE. Indeed, despite the alleged deficiencies in his performance,[21] Plaintiff was not relieved of patrol duties until after he failed to appear for the second FFDE. (Doc. 67-1 at p. 9). Thus, throughout

---

[20] The four factors to be considered include: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." 29 C.F.R. § 1630.2(r).

[21] Specifically, Defendants point to Plaintiff's handling of weapons, his alleged "fail[ure] to control the scene when he stopped violators or investigated a crash," the discretion exercised by Plaintiff in issuing tickets, and poor accident investigation. (Doc. 67-1 at p. 17).

the period relevant to this litigation, other than Plaintiff's leave of absence,[22] Plaintiff continued to carry a weapon and to perform all of the duties of a state trooper, including regularly interacting with the public while effecting traffic stops and investigating accidents. (*Id.* at pp. 1-9). Accordingly, the Court finds that Plaintiff has pointed to sufficient evidence from which a rational jury could find that Defendants' actions were not justified on the ground that Plaintiff posed a direct threat to himself and others.

Finally, to establish a business necessity defense, "a defendant must prove by a preponderance of the evidence that its qualification standards are: (1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation." *Atkins v. Salazar*, 677 F.3d 667, 681-82 (5th Cir. 2011).

Rather than articulating how they have met each element required to establish a business necessity defense, Defendants summarily assert that "the LSP fitness for duty exam is clearly job related and a business necessity." (Doc. 67-1 at p. 24). They also aver that "all of the elements of the Business Necessity defense have clearly been met in this case." (*Id.*) However, short of self-serving conclusory statements, Defendants offer no specific evidence to support their contentions that their qualification standards were (1) uniformly applied;[23] (2) job-related; (3)

---

[22] *See supra* note 9.

[23] With respect to this element, Defendants state that the FFDE is "uniformly applied," that DPS contracts with "Matrix, a licensed third-party psychiatrist to perform the exam[s]," and that Matrix

28

consistent with business necessity; and (4) could not be met by Plaintiff with a reasonable accommodation.

The facts also contradict Defendants' contention that its actions were warranted as a business necessity. Had Plaintiff truly been exhibiting character traits which "could potentially lead to catastrophic results," it seems unlikely that Plaintiff would have been permitted to ride alone effective March 26, 2012. (Doc. 67-1 at p. 22). Moreover, although Defendants state that the "uncontroverted medical evidence demonstrates that Plaintiff had continued issues with paranoid and irrational thoughts," (Doc. 67-1 at p. 22), the stark difference between Dr. Rostow and Dr. Patterson's assessments regarding Plaintiff's fitness for duty belies this assertion. In a letter dated February 11, 2011, Dr. Patterson and Nurse Stewart stated that "on January 7, 2011, all of [Plaintiff's] compulsive behavior and obsessive thoughts had stopped." (Doc. 67-17 at p. 1). By contrast, Dr. Rostow's February 8, 2011 evaluation characterizes Plaintiff as "paranoid, or unusually suspicious, anxious, bitter at the treatment he had received from some supervisors, and was defensive." (Doc. 67-18 at p. 2). The very purpose underlying the two evaluations was vastly different as well. As Dr. Rostow's report clarified, Matrix's recommendations were "not meant for clinical purposes," and not intended "to be used alone," but rather were intended "to be part of an overall review of [Plaintiff's]

---

uses a specific protocol in rendering its decision. (Doc. 67-1 at p. 24). However, Defendants cite to no evidence in the record to support these assertions. Summary judgment cannot be granted on the basis of bare assertions. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) ("mere conclusory allegations are not competent summary judgment evidence").

behavior," and a "form of consultation only." (Doc. 67-18 at pp. 1, 2, 7). By contrast, Plaintiff sought out clinical treatment by seeing Dr. Patterson and Nurse Stewart.

Lastly, Defendants' citation to case law from other circuits, specifically, *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) and *Brownfield v. City of Yakima*, 612 F.3d 1140 (9th Cir. 2010), regarding a different police department's procedure with facts that are not analogous to the instant case is equally unavailing. The police officer in *Watson* had a history of overreacting, and was found to be unusually defensive and antagonistic towards his co-workers. *Watson*, 177 F.3d at 934. There also was a litany of internal affairs investigations, disciplinary actions taken and grievances filed against the officer. *Id.* Eventually, the officer was relieved of duty without pay prior to undergoing his FFDE. *Id.* Similarly, the police officer in *Brownfield* also had a more checkered past than the Plaintiff here. He swore at his superiors, disregarded orders, and was highly emotional numerous occasions. *Brownfield*, 612 F.3d at 1143. The Police Department also received a domestic violence call from the officer's estranged wife, though charges were never filed. *Id.* Ultimately, like the police department in *Watson*, the police department in *Brownfield* took action to mitigate the possible threat posed by the officer before he underwent a FFDE by placing him on administrative leave. *Id.* at 1143-44. Plaintiff, by contrast, was only removed from patrol duty briefly after the first FFDE, and as stated previously, was reinstated after his own psychiatrist affirmed his fitness for duty shortly thereafter. (Doc. 67-1 at pp. 5-6).

Given these inconsistencies, the Court concludes that there is evidence from which a rational jury could find Defendants actions were not warranted as business necessity. Accordingly, there being material issues of fact regarding Plaintiff's ADA discrimination claim, Defendants' motion for summary judgment is **DENIED**.

### ii.        Harassment under the ADA

"A cause of action for disability-based harassment is 'modeled after the similar claim under Title VII.'" *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001); *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998). Thus, to succeed on a claim of disability-based harassment, the plaintiff must prove:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Id.* (internal quotations omitted) (quoting *Rio v. Runyon*, 972 F. Supp. 1446, 1459 (S.D. Fla. 1997)). A plaintiff need not establish the fifth element if the alleged harasser is a supervisor with immediate or higher authority over the employee. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

Plaintiff contends that "[t]he discriminatory actions taken against [him] as described [in his discrimination claim] . . . viewed in their totality, constitute harassment based on disability." (Doc. 87 at p. 31). Simply put, this is insufficient.

A workplace environment is hostile when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to

alter the conditions of the victim's employment." *Dediol v. Best Chevrolet, Inc.,* 655 F.3d 435, 441 (5th Cir. 2011) (quoting *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 771 (5th Cir. 2009)).  In determining whether a working environment is hostile or abusive, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  Incidental or intermittent age-based comments, disrespect, rudeness, or isolated incidents (unless exceptionally serious) are not discriminatory changes in the terms and conditions of a worker's employment. *Butler v. Ysleta Indep. School Dist.*, 161 F.3d 263*,* 269 n.3 (5th Cir. 19982) (sexual harassment context) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Even viewing the facts in a light most favorable to Plaintiff, Defendants' actions simply do not approach a level of conduct that would "destroy [Plaintiff's] opportunity to succeed in the workplace." *Hockman*, 407 F.3d at 326 (citation omitted).  Having failed to point to sufficient evidence from which a jury could conclude that the harassment complained of was severe or pervasive enough to affect a term, condition, or privilege of his employment, Plaintiff cannot overcome Defendants' motion for summary judgment.

Accordingly, Defendants' motion for summary judgment on Plaintiff's ADA harassment claim is **GRANTED**.

## B. Alleged Violation of Plaintiff's Right to Privacy

Defendants' final argument concerns Plaintiff's claims that the orders to submit for the FFDEs and the attendant requirement that Plaintiff produce medical and psychiatric records constituted an actionable invasion of privacy. (*See* Doc. 67-1 at pp. 24-27; Doc. 94-1 at p. 2).

"The tort of invasion of privacy is directed at redressing the damage which an individual suffers when legally recognized elements of his right to privacy have been violated." *Tate v. Woman's Hosp. Found.*, 2010-0425 (La. 1/19/11), 56 So. 3d 194, 197 (citing *Gorman v. Swaggart,* 524 So.2d 915, 920 (La. App. 4 Cir. 1988)). Louisiana law recognizes a cause of action for unreasonable disclosure of embarrassing private facts where "defendant's conduct is unreasonable and seriously interferes with the plaintiff's privacy interest." *See Daly v. Reed*, 95-2445 (La. App. 4 Cir. 2/15/96), 669 So.2d 1293, 1294. "To be actionable, it is not necessary that there be malicious intent on the part of the defendant; rather the reasonableness of the defendant's conduct in a breach of privacy action is determined by balancing the plaintiff's interest in protecting his privacy from serious invasions with the defendant's interest in pursuing his course of conduct." *Id.*

Here, Defendants first argue that any alleged invasion of privacy claim related to Plaintiff's first FFDE has prescribed. (Doc. 67-1 at p. 24). Plaintiff does not dispute this, and the Court agrees. *See* La. C.C. art. 3492 ("Delictual actions are subject to a liberative prescription of one year."). However, Plaintiff is pursuing

his privacy claim with respect to the second FFDE. (Doc. 87 at pp. 31-32). With respect to that claim, Defendants assert that the case of *White v. Gilless*, 47 F.3d 1172 (6th Cir. 1995) "establishes that Butler had no right of privacy" over the psychiatric records he was required to submit. (Doc. 67-1 at p. 26; Doc. 94-1 at p. 2). However, this is simply not the case. Not only are the facts of *White* not analogous to the facts of the instant case, Sixth Circuit precedent does not "establish" outcomes for courts in the Fifth Circuit. Thus, having failed to demonstrate that there is no genuine dispute as to any material facts, Defendants are not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Accordingly, Defendants' motion for summary judgment on Plaintiff's invasion of privacy claim is **DENIED**.

V.     Conclusion

For the foregoing reasons,

IT IS ORDERED that **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 52-1)** is **DENIED**.

IT IS FURTHER ORDERED that **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 65-1)** is also **DENIED**.

IT IS FURTHER ORDERED that **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 67-1)** is **DENIED IN PART** and **GRANTED IN PART**.

Baton Rouge, Louisiana, this _3rd_ day of December, 2014.

_____
**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**